## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Harley Ferch, | Case No. 14-cv-1961 (SRN/TNL) |
| Plaintiff, | |
| v. | **REPORT &** |
| | **RECOMMENDATION** |
| Warden B.R. Jett, | |
| Dr. Dionne Hart, | |
| Dr. Shelley R. Stanton, MD, and | |
| Barb Banitt, (AWS), | |
| Defendants. | |

Harley Ferch, # 03916-017, 506 Clay Street, Woodstock, IL 60098 (pro se Plaintiff); and

Ana H. Voss and D. Gerald Wilhelm, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendants).

## I. INTRODUCTION

This matter comes before the Court, United States Magistrate Judge Tony N. Leung, on Defendants' Amended Motion to Dismiss (ECF No. 65) and Motion to Dismiss Amended Complaint (Docket Nos. 63 and 77) (ECF No. 79). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Susan Richard Nelson, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Amended Motion to Dismiss (ECF No. 65) and Motion to Dismiss Amended Complaint (Docket Nos. 63 and 77) (ECF No. 79) be **GRANTED**.

## II. BACKGROUND

Plaintiff Harley Ferch "was civilly committed by the U.S. District Court for the Western District of Missouri . . . in 1999, pursuant to 18 U.S.C. § 4246, after being found incompetent to stand trial under 18 U.S.C. § 876." *Ferch v. Jett*, No. 14-cv-1961 (SRN/TNL), 2015 WL 251766, at *1 (D. Minn. Jan. 20, 2015). "Ferch has been diagnosed with Delusional Disorder and has been prescribed various medications to treat his condition." *Id.* "Since his commitment, annual risk assessments have been presented by the U.S. Bureau of Prisons (BOP) to the committing court, where Ferch has been represented by counsel. *Id.* (citing *United States v. Ferch*, No. 99-cv-3018 (W.D. Mo.)). "Ferch was transferred to FMC Rochester in 2000 . . . ." *Id.* Ferch brings the instant action for violation of his constitutional rights based on involuntary medication while at FMC Rochester.[1] Ferch now resides in Illinois. (*See* ECF No. 83.)

Defendant B.R. Jett is the warden of FMC Rochester. (BCRC at 1.) Defendant Dionne Hart, M.D., is a psychiatrist at FMC Rochester. (Decl. of Dr. Dionne Hart ¶ 1,

[1] Previously, Ferch filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, which along with a separately filed motion for injunctive relief raised two categories of claims: (1) those based on the fact or duration of his confinement which challenged certain issues related to his commitment proceedings in Missouri, and (2) those based on his conditions of confinement, namely, involuntary medication. *See Ferch*, 2015 WL 251766, at *1-2. Ferch's claims regarding the commitment proceedings were dismissed without prejudice so that they could be raised before the committing court, which "is in a better position to consider [such] claims." *Id.* at *5. As for claims related to his conditions of confinement, Ferch was given leave to "file an amended pleading, styled as a *Bivens* civil rights complaint, identifying any such claims and parties, within 30 days." *Id.* Ferch subsequently filed a "Bivens Civil Rights Complaint (Amended Pleading)" ("BCRC") (ECF No. 43).

2

ECF No. 69.)  Dr. Hart "was [Ferch's] treating psychiatrist during the relevant time period in this matter, 2011 through 2013."  (Hart Decl. ¶ 3.)  Shelley R. Stanton, M.D., is the Chief of Psychiatry at FMC Rochester.  (Decl. of Dr. Shelley Stanton ¶ 1, ECF No. 70.)  Barb Banitt is the Associate Warden's Secretary at FMC Rochester.  (Decl. of Barb Banitt ¶ 1, ECF No. 68.)

In August 2011, Ferch "signed a Medical Treatment Refusal form," indicating that he was refusing treatment, namely, his prescribed dose of olanzapine, because he had recovered from his mental illness.[2]  (BCRC at 1; Ex. A to BCRC, ECF No. 43-1.[3])  Dr. Hart, Ferch's treating psychiatrist, "did not pursue involuntary medication" at the time because "Ferch was not gravely disabled or at risk of harming himself or others."  (Hart Decl. ¶ 9.)  Over approximately the next two months, Ferch "became more symptomatic."  (Hart Decl. ¶ 9; *see* Hart Decl. ¶¶ 9-11.)  Dr. Hart then pursued involuntary medication.  (Hart Decl. ¶ 12; Stanton Decl. ¶ 10.)

### A. Involuntary Medication Procedure: Program Statement 6010.03

During the relevant time, involuntary medication was governed by FMC Rochester's Program Statement 6010.03 Psychiatric Evaluation and Treatment.  (Stanton Decl. ¶ 4; Ex. A to Stanton Decl, ECF No. 70-1 ("Program Statement 6010.03".)  Under Program Statement 6010.03, "psychiatric medication . . . [could] only be involuntarily administered [to Ferch] after an administrative hearing . . . complying with the procedural

---

[2] "Olanzapine is used to treat nervous, emotional, and mental conditions (e.g., schizophrenia)."  *Olanzapine*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001300/ (last visited January 28, 2016).
[3] Ferch has filed a number of consecutively lettered exhibits since the beginning of this lawsuit and has incorporated previously filed exhibits by reference in subsequent pleadings.  The Court refers to these exhibits as "Ferch Ex. [Letter]."  Page citations refer to the ECF page number as the individual exhibits are not uniformly paginated.

safeguards in Section 7." (Program Statement 6010.03 § 6.) *See* 28 C.F.R. § 549.45(c) (requiring certain administrative procedures set forth in 28 C.F.R. § 549.46 before medication may be involuntarily administered). The relevant portions of Program Statement 6010.03 essentially mirror the requirements of the applicable portions of 28 C.F.R. § 549.46 (procedures for involuntary administration of psychiatric medication).

### 1. Notice

Program Statement 6010.03 required that the individual "be provided 24-hours advance written notice of the date, time, place, and purpose of the hearing, including an explanation of the reasons for the psychiatric medication proposal." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(2). Notice was provided using "form BP-A0959, 'Notice of Hearing and Advisement of Rights for Involuntary Hospitalization or Medication for Psychiatric Care or Treatment.'" (Program Statement 6010.03 § 7.) The notice form was "filled out only by the referring psychiatrist currently involved in the diagnosis or treatment of the [individual]" and could be delivered to the individual by "[a]ny staff member . . . ." (Program Statement 6010.03 § 7.)

### 2. Hearing Rights

Program Statement 6010.03 also required that the individual "be informed of the right to appear at the hearing, to present evidence, to have a staff representative, to request witnesses, and to request that witnesses be questioned by the staff representative or by the person conducting the hearing." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(3). "If the [individual] does not request a staff representative, or requests a staff representative with insufficient experience or education, or one who is not

4

reasonably available, the institution mental health division administrator . . . [was required to] appoint a qualified staff representative." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(3).

### 3. Hearing & Hearing Report

Program Statement 6010.03 required that the hearing "be conducted by a psychiatrist other than the attending psychiatrist, and who is not currently involved in the diagnosis or treatment of the [individual]." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(4). With respect to witnesses, Program Statement 6010.03 stated that "[w]itnesses should be called if they are reasonably available and have information relevant to the [individual's] medical condition or need for psychiatric medication. Witnesses who will provide only repetitive information need not be called." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(5). Program Statement 6010.03 required that "[a] treating/evaluating psychiatrist/clinician, who has reviewed the case, . . . be present . . . and . . . present clinical data and background information relative to the [individual's] need for psychiatric medication." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(6). Other members of the treating/evaluating team could also be called "to provide relevant information." (Program Statement 6010.03 § 7.) *See* 28 C.F.R. § 549.46(a)(6).

Under Program Statement 6010.03,

> [t]he psychiatrist conducting the hearing must determine whether involuntary administration of psychiatric medication is necessary because, as a result of the mental illness or disorder, the [individual] is dangerous to self or others, poses a serious threat of damage to property affecting the security

5

> or orderly running of the institution, or is gravely disabled
> (manifested by extreme deterioration in personal functioning).

(Program Statement 6010.03 § 7.)  *See* 28 C.F.R. § 549.46(a)(7).  "The psychiatrist [conducting the hearing] must prepare a written report regarding the initial decision," which then "must be promptly provided" to the subject individual.  (Program Statement 6010.03 § 7.)  *See* 28 C.F.R. § 549.46(a)(8).

The individual could then appeal the decision to FMC Rochester's mental-health-division administrator within 24 hours of receipt.  (Program Statement 6010.03 § 7.)  *See* 28 C.F.R. § 549.46(a)(8).  "If the [individual] appeals the initial decision, psychiatric medication must not be administered before the administrator issues a decision on the appeal, unless a[ specified] exception exists . . . ."  (Program Statement 6010.03 § 7.)  *See* 28 C.F.R. § 549.46(a)(9).  "The [individual's] appeal will ordinarily be reviewed by the administrator or his designee within 24 hours of its submission.  The administrator will review the initial decision and ensure that the [individual] received all necessary procedural protections, and that the justification for administering psychiatric medication is appropriate."  (Program Statement 6010.03 § 7.)  *See* 28 C.F.R. § 549.46(a)(9).

## B.  Involuntary Medication of Ferch

At issue are three "rounds" of the involuntary-medication process, which Ferch refers to as the "Due Process Hearings of 2011, 2012, and 2013."  (BCRC at 1; *see, e.g.*, BCRC at 2.)  During the relevant time, "FMC Rochester would provide an [individual] under an involuntary medication protocol with annual due process hearings if he continued refusing to consent to treatment."  (Hart Decl. ¶ 14; *see* Stanton Decl. ¶ 9.)

6

### 1. 2011

Following Ferch's refusal to take his medication at the end of August, Dr. Hart began to notice changes in Ferch.  (Hart Decl. ¶¶ 9-11.)  "In September 2011, . . . Ferch became argumentative and irritable, and his thoughts were perseverative and circumstantial.  He became more intrusive, and his speech was pressured.  Nursing staff observed he appeared to have difficulty sleeping at night."  (Hart Decl. ¶ 9.)

In a declaration submitted by Dr. Hart, she states that Ferch's "work supervisor reported [Ferch] was disruptive due to his paranoia and need to talk about his perceptions of injustice."  (Hart Decl. ¶ 9.)  Ferch has submitted a Work Performance Rating dated September 30, 2011, signed by his supervisor.  (Ferch Ex. D at 20, ECF No. 1-1.)  On a scale of "unsatisfactory" to "outstanding," Ferch was given the second-highest rating of "good."  (Ferch Ex. D at 20.)  Ferch's supervisor recommended that Ferch receive a bonus and noted that Ferch was a "good worker in the workshop."  (Ferch Ex. D at 20.)

"In the evening of October 19, 2011, . . . Ferch was observed awake and pacing the unit throughout the night.  The next day, his peers reported that he was pacing the hallway and making aggressive statements about getting guns and hurting people."  (Hart Decl. ¶ 10.)  Although "Ferch denied making these statements, . . . staff were concerned about his mental state and placed him in seclusion."  (Hart Decl. ¶ 10.)  "While staff were packing his property, they located numerous envelopes containing disorganized writings."  (Hart Decl. ¶ 10.)

> In seclusion, . . . Ferch was observed to have continued difficulty sleeping at night, although he reported feeling rested.  He was also observed talking loudly to himself, and

> he voiced grandiose beliefs about his ability to call attention
> to perceptions of injustice.  His speech was pressured, his
> thoughts appeared to race, and he was distractible.

(Hart Decl. ¶ 11.)  "At this point, [Dr. Hart] concluded . . . Ferch was gravely disabled and posed a threat to himself and others as he could not live in an open unit," and "initiated the involuntary medication proceedings."  (Hart Decl. ¶ 12.)

Ferch has submitted a Work Performance Rating from the same time period; this one is dated October 31, 2011.  (Ferch Ex. D at 21.)  The Work Performance Rating is signed by Ferch's supervisor, who gave Ferch the highest rating of "outstanding."  (Ferch Ex. D at 21.)

Banitt "was asked to prepare [a] Notice of Medication Hearing and Advisement of Rights" form [(the '2011 Notice')] based on information provided to [her] by [Dr. Hart]".  (Banitt Decl. ¶ 3; *see* Ex. A to Banitt Decl., ECF No. 68-1 at 2 (the "2011 Notice"); *see also* Stanton Decl. ¶ 12; Ex. C to Stanton Decl., ECF No. 70-1 at 18.)  The 2011 Notice stated that Ferch's diagnosis was "Delusional Disorder, Persecutory Type" and the proposed treatment was "antipsychotics, antidepressants, anxiolytics, mood stabilizers, [and] benzodiazepines" because Ferch "is gravely disabled and [a] danger to self and others."  (2011 Notice.)  The 2011 Notice stated that the hearing would be held on October 31 and informed Ferch of his hearing rights.  (2011 Notice.)  Ferch was appointed a staff representative, a registered nurse, by Dr. Stanton.  (2011 Notice.)  Banitt delivered the 2011 Notice to Ferch on October 24, approximately one week before the hearing.  (Banitt Decl. ¶ 3; 2011 Notice; *see also* Stanton Decl. ¶ 12.)

The hearing was conducted on October 31. (Ex. D to Banitt Decl. (2011 Involuntary Medication Report, 2011 Due Process for Involuntary Medication Hearing Report ("2011 Due Process Report")), ECF No. 68-1 at 8, 15; *see also* Ex. D to Stanton Decl., ECF No. 70-1 at 19-29.) Orlando Maldonado, M.D., a staff psychiatrist, conducted the hearing, which was attended by Dr. Hart, the staff representative, and Banitt. (2011 Due Process Report at 1.) Banitt's role was "to take notes of the proceedings." (Banitt Decl. ¶ 4.)

Although it is not entirely clear, it appears that Ferch also attended the hearing. (*See* 2011 Involuntary Medication Report; 2011 Due Process Report; Pl.'s Rebuttal at 3 ("This is another lie as I remained calm and collective [sic] during the hearings and any report that claims I did not is a fraudulent report!"), ECF No. 63.) The 2011 Involuntary Medication Report includes a statement from Ferch in the "Summary of the Evidence" section: "The meds are helping...I'm not sure why I'm here in SHU, nobody told me why I'm here." (2011 Involuntary Medication Report at 3 (alteration in original).) The 2011 Involuntary Medication Report and 2011 Due Process Report each note that Ferch's staff representative indicated that Ferch wanted both audio and video recordings of the hearing. (2011 Involuntary Medication Report at 5; 2011 Due Process Report at 1.)

In the 2011 Due Process Report, Dr. Maldonado recounted Ferch's history leading to his commitment, his transfer to FMC Rochester in 2000, and general observations of Ferch while at FMC Rochester. (2011 Due Process Report at 1-2; *see* 2011 Involuntary Medication Report at 6.) Dr. Maldonado then turned to the events of fall 2011 giving rise

to the involuntary-medication proceedings.   (2011 Due Process Report at 2.)   Dr.

Maldonado stated:

> Most recently, Dr. Dionne Hart reported [Ferch] has been
> unable to sleep well, has been increasingly verbally and
> physically agitated, hyperverbal, insolent, increasingly
> paranoid, and gathering evidence he suffers from no mental
> illness.  Most recently, [Ferch] decided to discontinue his
> medication.  On October 20, 2011, [Ferch] was transferred to
> the Special Housing Unit (SHU), as he continues to
> deteriorate in his mental illness.

(2011 Due Process Report at 2; *see* 2011 Involuntary Medication Report at 6.)   Dr.

Maldonado observed that, upon placement in the SHU, Ferch "initially was reporting he

needs no medication for his mental illness," but, "recently, [Ferch] began to accept the

medication offered by Dr. Dionne Hart."   (2011 Due Process Report at 2; *see* 2011

Involuntary Medication Report at 6.)

Despite taking his medication, Ferch continued to be "increasingly angered and

voicing or reporting he suffers from no mental illness"; "pressured and intrusive"; and

"easily agitated."  (2011 Due Process Report at 2.)  Additionally, Dr. Maldonado wrote:

> It is reported that [Ferch] has several documents in his
> possession including a copy of notice of dismissal of the
> instant offense and past risk panels.  . . . He claimed the
> charges for the instant offense caused his mental illness and
> those same symptoms were resolved after charges were
> dismissed.  [Ferch] continues to report this was a "set up" by
> a county sheriff who knew [him] from the past.  [Ferch]
> reported he continues to gather evidence to prove he does not
> suffer from any mental illness.  [Ferch] reported he plans to
> stop all psychotropic medications indefinitely, partially
> because the risk panel has reported he is without insight into
> his mental illness.

(2011 Due Process Report at 2; *see* 2011 Involuntary Medication Report at 6.)

10

Dr. Maldonado noted that Dr. Hart "conducted a well-documented presentation which includes . . . Ferch's latest clinical presentation." (2011 Due Process Report at 1.) Dr. Maldonado stated that, in Dr. Hart's opinion, Ferch "continues to suffer from a major mental illness, namely Delusional Disorder, Persecutory Type," and that Ferch would benefit from medication. (2011 Due Process Report at 2.) Dr. Hart opined that "the use of psychotropic medication such as antipsychotic medication for [Ferch's] delusional system might help in decreasing at least the intensity of the paranoid delusional thinking"; "the use of benzodiazepines for sedation might help him in de-escalating when [he] is highly agitated"; and "the use of mood stabilizer medications and antidepressant medication might also be of help as needed." (2011 Due Process Report at 2.) Dr. Hart "opin[ed] the current medications would lessen any symptoms of mental illness." (Due Process Report at 2.)

Dr. Maldonado agreed with Dr. Hart's "diagnosis and treatment recommendations," concluding that "Ferch suffers from a major mental illness, namely Delusional Disorder, Persecutory Type"; Ferch "is, at the present time, in need of medical treatment for his mental illness"; and Dr. Hart's "proposed treatment will at least diminish his aggressiveness, disorganized behavior, and delusional thinking." (2011 Due Process Report at 2-3.) Dr. Maldonado concluded that "this is the least restrictive alternative" and Ferch "is gravely disabled and in danger of seriously hurting or harming others." (2011 Due Process Report at 3; *see* 2011 Involuntary Medication Report at 6.) In the "findings" section of the 2011 Involuntary Medication Report, Ferch was also found to be a danger to himself. (2011 Involuntary Medication Report at 6.)

11

Dr. Maldonado noted that Ferch was still in the "SHU, where he was contacted today." (2011 Due Process Report at 3.)  Dr. Maldonado noted that Ferch was "calm and cooperative" and "agreed to continue with his medications as proposed by Dr. Dionne Hart." (2011 Due Process Report at 3.)  Ferch also reported that "his medication has been of help in 'clearing his thinking.'" (2011 Due Process Report at 3.)  Ferch "gave some documents to Dr. Hart for them to discuss some questions he has," "ask[ed] appropriately about any appeals decisions, and . . . was redirected to . . . Banitt." (2011 Due Process Report at 3.)

Ferch appealed Dr. Maldonado's determination on November 2. (Ex. B to Stanton Decl., ECF No. 70-1 at 16.)  Ferch stated the following reasons as the basis for his appeal:

> There are numerous incorrect or false claims made on page 1 concerning my rights to have witnesses at my hearing and that I failed to request a staff representative to appear on my behalf.  Page 6 in justification section makes numerous false claims against me! To [sic] many to list here!

(Ex. B to Stanton Decl.)

Ferch's appeal was reviewed by Dr. Stanton.  (Stanton Decl. ¶ 12; Ex. B to Stanton Decl.)  Dr. Stanton denied Ferch's appeal, concluding:

> A review of your appeal and the hearing report show [sic] that you were afforded all due process rights.  The Hearing Officer determined that you would benefit from medication. Based on my review of the record, that determination is supported by the evidence and is medically appropriate. Additionally, based on my review of the record, medication is indicated as the treatment of choice for ameliorating your symptoms, and the treatment needs can not [sic] reasonably be met by less intrusive means.

(Ex. B to Stanton Decl.; *see* Stanton Decl. ¶¶ 12-13.)

### 2.  2012

Dr. Hart initiated the involuntary-medication process again in 2012 because, "based on [her] professional judgment, . . . Ferch was gravely disabled and posed a risk to himself and others if he was not on medication."  (Hart Decl. ¶ 14.)  On October 24, Banitt gave Ferch notice of the October 29 hearing and his hearing rights.  (Banitt Decl. ¶ 3; Ex. E to Banitt Decl. (2012 Involuntary Medication Report, 2012 Annual Due Process for Involuntary Medication Hearing Report ("2012 Due Process Report"), ECF No. 68-1 at 19-28); Ex. F to Stanton Decl. ("2012 Notice"), ECF No. 70-1 at 35.[4])  Like the 2011 Notice, the 2012 Notice stated that Ferch's diagnosis was "Delusional Disorder, Persecutory Type" and the proposed treatment was "antipsychotics, antidepressants, anxiolytics, mood stabilizers, [and] benzodiazepines" because Ferch "is gravely disabled and [a] danger to self and others."  (2012 Notice.)  A staff representative, a psychologist, was again appointed for Ferch.  (2012 Notice.)  This time, Ferch requested witnesses at the hearing.  (2012 Notice.)

Dr. Maldonado conducted the hearing on October 29.  (2012 Due Process Report at 1.)  Again, although not entirely clear, it appears Ferch attended this hearing as well. (*See* 2012 Due Process Report at 1; 2012 Involuntary Medication Report at 3; Pl.'s Rebuttal at 3.)  Also in attendance at the hearing were Dr. Hart, Banitt, the staff

---

[4] While Exhibit B to the Banitt Declaration purports to be the 2012 Notice, (*see* Banitt Decl. ¶ 3), it appears that the 2011 Notice was inadvertently included instead, (*see* Ex. B to Banitt Decl., ECF No. 68-1 at 4).  A copy of the 2012 Notice, however, was appended to Dr. Stanton's declaration.  (Ex. F to Stanton Decl.)  Ferch has also included a copy of the 2012 Notice in his materials.  (Ferch Ex. E, ECF No. 5-1 at 3.)

representative, Ferch's work supervisor, and Ferch's roommate.  (2012 Due Process Report at 1; *see* 2012 Involuntary Medication Report at 1, 4, 5.)  Again, Banitt's role was "to take notes of the proceedings."  (Banitt Decl. ¶ 4.)

Dr. Hart "reported [that Ferch] has been functioning fairly well on the open unit and compliant with his recommended treatment."  (2012 Due Process Report at 2.)  Dr. Hart reported that Ferch, however, "continues to argue about his mental health, symptoms of psychosis, or need for medications."  (2012 Due Process Report at 2.)  Dr. Hart also reported that, "a short time ago, [Ferch] mailed a letter and was ordering law enforcement badges, which [he] was planning to use to impersonate an investigator on the outside. . . . Ferch reported he wants to be a 'legal technician.'  When inquired further, he would not disclose any further information."  (2012 Due Process Report at 2-3.)  Dr. Hart reported that Ferch "will not work with" her and "will not take any medication adjustments needed."  (2012 Due Process Report at 3.)  Dr. Hart reported that Ferch "acknowledged having delusional thinking in the past but 'not any longer since 2002.'"  (2012 Due Process Report at 3.)  Dr. Hart noted that Ferch was "easily upset and serious when discussing those issues."  (2012 Due Process Report at 3.)

Dr. Hart opined that Ferch "continues to suffer from a major mental illness, namely Delusional Disorder, Persecutory Type," and would benefit from medication. (2012 Due Process Report at 3.)  Dr. Hart further opined that "the current medications would lessen any symptoms of [Ferch's] mental illness" and, "[h]istorically, while on psychotropic treatment, . . . Ferch's overall functioning improved substantially, and no verbal or physical agitations were reported."  (2012 Due Process Report at 3.)

14

Ferch also gave a statement, in which he

> reported that he is doing "O.K." and is sleeping well. He
> stated he has no problems with the medications and is taking
> enough of them right now. He reported he has no anxiety or
> delusions. The only side effect he suffers from is sore joints
> for which he is taking Cogentin. He stated he used to have
> delusional thinking but has no more active symptoms. . . .
> Ferch stated, "In [sic] April 26, 2002, they dropped my
> charges and my mental illness became inactive." He reported
> his delusional disorder is in remission and read numerous
> notes from clinicians that he has no active symptoms. . . .
> Ferch asked, "How can you decide if I suffer from psychosis
> without knowing me long enough?"

(2012 Involuntary Medication Report at 3; *see* 2012 Due Process Report at 1.)  "When

asked about the letter [Ferch] wrote to an outside source requesting more information on

obtaining badges to become a legal technician and go into prisons, he stated the letter was

intercepted and he has since found out he cannot do that job without attorney assistance."

(2012 Involuntary Medication Report at 3.)

Similarly, Ferch "provided a two-page synopsis to his appointed staff

representative," who reported the following on his behalf:

> [Ferch] stated he is taking his medications voluntarily but has
> a phobia of needles. [Ferch] relayed that he had asked two
> witnesses to attend the hearing on his behalf. . . . Ferch stated
> his master treatment plan states his diagnosis is in remission.
> [Ferch] reportedly has two motions for discharge hearings
> and submitted exhibits regarding the fact that he has no active
> symptoms and has completed numerous educational pursuits
> (e.g., anger management class). [Ferch] stated the reports that
> were made about him when he was off his medications for
> two months last year were wrong."

(2012 Involuntary Medication Report at 5; *see* 2012 Due Process Report at 1.)

As for Ferch's witnesses, Ferch's supervisor "stated that he is a very good worker, very reliable, and punctual." (2012 Involuntary Medication Report at 4; *see* 2012 Due Process Report at 1.)  Ferch's supervisor stated that "he has had no problems with [Ferch], and [Ferch] is currently in charge of the laundry program." (2012 Due Process Report at 1.)  Ferch's roommate stated that "he has been a roommate of . . . Ferch's for the past four months." (2012 Involuntary Medication Report at 4.)  Ferch's roommate described him as "quiet" and "organized" and stated Ferch "works on his legal work a lot of the time which makes him a little anxious." (2012 Involuntary Medication Report at 4; *see* 2012 Due Process Report at 1.)  Ferch's roommate "reported no issues and does not see anything wrong with . . . Ferch mentally." (2012 Involuntary Medication Report at 4; *see* 2012 Due Process Report at 1.)

In reaching his decision to continue involuntary medication, Dr. Maldonado again summarized Ferch's history, including Ferch's placement in the SHU in 2011 following his refusal to take his medications. (2012 Due Process Report at 2; *see* 2012 Involuntary Medication Report at 6.)  Dr. Maldonado noted that Ferch "was convinced to continue taking his medication and as such, he has continued to do so." (2012 Due Process Report at 2; *see* 2012 Involuntary Medication Report at 6.)  Dr. Maldonado noted that Dr. Hart "conducted a well-documented presentation which includes . . . Ferch's latest clinical presentation." (2012 Due Process Report at 1.)  Dr. Maldonado "concur[red] with Dr. Dionne Hart's diagnosis and treatment recommendations," concluding that Ferch "suffers from a major mental illness, namely [D]elusional [D]isorder, [P]ersecutory [T]ype"; Ferch "is, at the present time, in need of medical treatment for his mental illness"; and

16

Dr. Hart's "proposed treatment will at least diminish his aggressiveness, disorganized behavior, and delusional thinking."  (2012 Due Process Report at 3.)  Dr. Maldonado concluded that "this is the least restrictive alternative" and Ferch "is gravely disabled and in danger of seriously hurting or harming others."  (2012 Due Process Report at 3; *see* 2012 Involuntary Medication Report at 6.)  Like the 2011 Involuntary Medication Report, the 2012 Involuntary Medication Report included a finding that Ferch was a danger to himself.  (2012 Involuntary Medication Report at 6.)

Dr. Maldonado further noted that Ferch "presented today as calm and cooperative; however, he became upset with the idea of medication dosage adjustment."  (2012 Due Process Report at 3.)  Ferch, nonetheless, "agreed to continue his medications as proposed by Dr. Dionne Hart and to work with her."  (2012 Due Process Report at 3.)  Ferch reported that "his medication has not been of help" and "he has no mental illness or need for medications."  (2012 Due Process Report at 3.)  Ferch stated "he is doing well with Prolixin[5] and has no voices or delusions."  (2012 Due Process Report at 3.)  Ferch was informed of Dr. Maldonado's determination and his appeal rights.  (2012 Due Process Report at 3.)

Ferch appealed Dr. Maldonado's determination, stating that "[t]he [2012] Involuntary Medication Report is falsified in many parts and [his] Due Process rights were violated because [he] was not served written notice within 24 hours of the [October 29] hearing."  (Ex. E to Stanton Decl., ECF No. 70-1 at 1; *see* Stanton Decl. ¶ 14.)  Ferch

---

[5] Prolixin is a brand name for fluphenazine, "antipsychotic medication used to treat schizophrenia and psychotic symptoms such as hallucinations, delusions, and hostility."  *Fluphenazine*, MedlinePlus, U.S. National Library of Medicine, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682172.html (last accessed January 28, 2016).

also asserted that Dr. Maldonado did not include a sufficient explanation of the reasons for the determination; his staff representative did not help him obtain certain documents; and his staff representative did not assist in preparing his appeal. (Ex. E to Stanton Decl.; *see* Stanton Decl. ¶ 14.) Additionally, Ferch asserted that statements he made (including, among other things, those addressing his mental health, need for medication, and work as a legal technician) were fully protected by his constitutional rights and did not demonstrate any dangerousness. (Ex. E to Stanton Decl.) Dr. Stanton denied Ferch's appeal, stating that Ferch had been afforded due process; Dr. Maldonado's determination that Ferch would benefit from medication "is supported by the evidence and medically appropriate"; and "medication is indicated as the treatment of choice for ameliorating [Ferch's] symptoms, and [Ferch's] treatment needs can not [sic] reasonably be met by less intrusive means." (Ex. E to Stanton Decl.; *see* Stanton Decl. ¶¶ 14-16.)

Ferch has provided three Work Performance Ratings completed in the months of August, September, and October by his supervisor. (Ferch Ex. G, ECF No. 31 at 8-10.) Ferch was rated in the second-highest and highest categories. (Ferch Ex. G.)

### 3. 2013

Dr. Hart sought involuntary medication of Ferch in 2013 as well because he "was gravely disabled and posed as risk to himself and others if he was not on medication." (Hart Decl. ¶ 14.) Again, like the 2011 and 2012 Notices, Banitt provided Ferch notice of the upcoming hearing, which stated that Ferch's diagnosis was "Delusional Disorder" and the proposed treatment was "antipsychotics, antidepressants, anxiolytics, mood stabilizers, and benzodiazepine" because Ferch "is gravely disabled and [a] danger to self

18

and others."  (Banitt Decl. ¶ 3; Ex. C to Banitt Decl. ("2013 Notice"), ECF No. 68-1 at 6.)  Ferch requested that his work supervisor and roommate appear as witnesses and Ubaldo Bocanegra, M.D., serve as his staff representative.  (2013 Notice.)  Ferch was also appointed another staff representative, a licensed social worker.[6]  (2013 Notice.)

The timing of the 2013 Notice is rather unclear from the record.  It appears that Banitt initially notified Ferch on October 15 of a hearing set for October 29 and his concomitant hearing rights.  (2013 Notice.)  There is a note on the 2013 Notice, however, from "BB" dated October 28, noting that the hearing was "rescheduled due to staff absences."  (2013 Notice.)  The October 29 hearing date is crossed out and replaced with a November 1 date.  (2013 Notice.)  Moreover, the 2013 Involuntary Medication Report, which was also prepared by Banitt, lists a hearing date of October 29 and states that Ferch was given advanced notice of the hearing on October 17.  (Ex. F to Banitt Decl., 68-1 at 30; *see* Banitt Decl. 5.)   The 2013 Annual Due Process for Involuntary Medication Hearing Report ("2013 Due Process Report") states that the hearing in fact occurred on November 1.  (Ex. F to Banit Decl., ECF No. 68-1 at 37.)  In any event, it appears that Ferch was notified of his hearing rights as of at least October 15 and, even if he was not informed of the rescheduling until October 28, Ferch still received more than 24-hours' notice of the November 1 hearing.

The hearing was conducted on November 1 by Dr. Maldonado.  (2013 Due Process Report at 1.)   Dr. Hart, the appointed staff representative, Banitt, Ferch's

---

[6] The exact title of the licensed social worker is not clear from the record.  (*Compare* 2013 Notice *with* 2013 Involuntary Medication Report at 5; 2013 Due Process Report at 1.)

19

supervisor, and Ferch's roommate attended the hearing.  (2013 Due Process Report at 1.)

Ferch's requested representative, Dr. Bocanegra, was not able to attend due to a

"scheduling conflict."  (2013 Involuntary Medication Report at 4.)  Ferch participated in

the hearing and "had the chance to interview both [of his] witnesses during this hearing,

mainly regarding his behavior presentation on the unit, medication use, and diagnosis."

(2013 Due Process Report at 1; *see* 2013 Involuntary Medication Report at 5; Pl.'s

Rebuttal at 3.)

In a "Patient Statement," Ferch "reported that he has suffered medication issues

such as constipation, shakiness, cramps in the morning, and muscle movements he feels

he should not be having."  (2013 Involuntary Medication Report at 3.)  "[Ferch] reported

that he has been hospitalized three times and does not have a mental illness at this time.

He thinks his behavior is under control because his charges were dismissed.  He reported

the medications do not help him."  (2013 Involuntary Medication Report at 3.)

Ferch's work supervisor stated that "Ferch is a good, reliable worker and has no

problems in the workshop."  (2013 Involuntary Medication Report at 4; *see* 2013 Due

Process Report at 1.)  Ferch's roommate reported that he has lived with Ferch "for the

past 1 1/2 years and has seen no issues or signs of disturbed behavior."  (2013

Involuntary Medication Report at 4; *see* 2013 Due Process Report at 1.)   Ferch's

roommate also reported that he has witnessed Ferch experience side effects from his

medication "such as shakiness when he is lying down."  (2013 Involuntary Medication

Report at 4.)  Ferch's roommate stated that "Ferch is stable now and does not display any

signs of a mental illness." (2013 Involuntary Medication Report at 4; *see* 2013 Due Process Report at 1.)

Dr. Hart reported that Ferch "has been functioning fairly well on the open unit and compliant with his recommended treatment." (2013 Due Process Report at 3.) Dr. Hart reported that Ferch "attends his medical appointments"; "works in the workshop on the unit"; "seems to be, at times, cordial"; and "continues to be compliant with his medications under 'duress.'" (2013 Due Process Report at 3; *see* 2013 Involuntary Medication Report at 6.) Dr. Hart reported that Ferch has "regular" contact with his family and "no longer talks of being a paralegal, undercover agent, or thinks he is a law enforcement officer." (2013 Due Process Report at 3.) Dr. Hart also reported that Ferch "continues to have paranoid delusional thinking" and "has no insight into his mental illness." (2013 Due Process Report at 3; *see* 2013 Involuntary Medication Report at 6.) Dr. Hart opined that Ferch "continues to suffer from a major mental illness, namely Delusional Disorder, Persecutory Type" and would benefit from medication. (2013 Due Process Report at 3.) It was again noted that "[h]istorically, while on psychotropic treatment, . . . Ferch's overall functioning improved substantially, and no verbal or physical agitations were reported." (2013 Due Process Report at 3; *see* 2013 Involuntary Medication Report at 6.)

In addition to recounting the information provided by these witnesses, Dr. Maldonado also recounted some additional events from the past year in the 2013 Due Process Report:

Records indicate [Ferch] had a risk assessment convene[d] on October 16, 2012. At the end of December 2012, Dr. Hart became increasingly concerned about [Ferch's] increase[d] level of agitation and preoccupation with his perception of injustice. [Ferch] declined the recommend medication increase. . . . On February 28, 2013, it was reported [that Ferch] continued to ask his psychologist to change numerous items in his annual risk assessment report. At the time, [Ferch] was insistent that he had no[t] suffered from mental illness in many years. It was described [that Ferch] had episodic agitation. As of August 27, 2013, [Ferch] has remained on the open unit. There were no known incidents of inappropriate or aggressive behavior. [Ferch] has remained compliant with psychiatric medication under involuntary protocol; however, he continues to have no insight into his mental illness. He has also refused to participate in recommended therapeutic and recreational programming but has remained employed in the unit workshop. As of this time, [Ferch] continues to argue he has no mental illness or need for psychotropic medication. On October 20, 2013, [Ferch] refused his simvastatin[7], allegedly because it was causing him to have muscle cramps/discomfort in his shoulders and legs. At the time, [Ferch] reported he had been refusing such medication for the past three weeks. He also reported he has no plans to take medications when he goes home. A note dated October 29, 2013, indicated [Ferch] appeared "increasingly preoccupied with his perceptions of a conspiracy between Drs. Hart, Stanton, and Maldonado to falsify his records in order to involuntarily treat his mental illness. It was noted [that Ferch] reported he was planning to file grievances against these doctors and expressed confidence in his ability to expose his perceptions of "injustice." Thus far, [Ferch] has remained unresponsive to education about the nature of his mental illness and civil commitment. He continues to deny perceptual disturbances, depression, or suicidal ideations. . . . Ferch is of the opinion he has been inappropriately misdiagnosed with mental illness and inappropriately treated under involuntary protocol.

(2013 Due Process Report at 2-3; *see* 2013 Involuntary Medication Report at 6.)

---

[7] Simvastatin is a medication used to "[t]reat high cholesterol and triglyceride levels." *Simvastatin (By Mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012124/ (last visited January 28, 2016).

Dr. Maldonado agreed with Dr. Hart's "diagnosis and treatment recommendations" and concluded that Ferch "suffers from a major mental illness, namely [D]elusional [D]isorder, [P]ersecutory [T]ype" and "is, at the present time, in need of medical treatment for his mental illness." (2013 Due Process Report at 4.) Dr. Maldonado concluded that Dr. Hart's "proposed treatment will at least diminish [Ferch's] aggressiveness, disorganized behavior, and delusional thinking" and "is the least restrictive alternative." (2013 Due Process Report at 4.) Dr. Maldonado concluded that Ferch "is gravely disabled and in danger of seriously hurting or harming others if not treated properly." (2013 Due Process Report at 4; *see* 2013 Involuntary Medication Report at 6.) The 2013 Involuntary Medication Report also states that Ferch was found to be a danger to himself. (2013 Involuntary Medication Report at 6.)

Dr. Maldonado further noted that "[t]oday, [Ferch] reported feeling 'great' and voiced no major side effects from his medications." (2013 Due Process Report at 4.) Ferch "acknowledged wanting to continue working with Dr. Hart together" and "voiced concerns with medication use and muscle movement, for which he was again directed to continue working together with Dr. Hart, his primary psychiatrist." (2013 Due Process Report at 4.) Lastly, Ferch "reported he thinks nothing will happen if he stops his medications, and he claimed he has no benefit by using his psychotropic medications." (2013 Due Process Report at 4.)

Ferch also appealed this determination. (Stanton Decl. ¶ 17; Ex. H to Stanton Decl., ECF No. 70-1 at 48.) Ferch challenged the findings of the 2013 Involuntary Medication Report, stating "several lies are told about my present mental health status."

(Ex. H to Stanton Decl.)  Ferch "request[ed] an interview with Dr. Shelley Stanton MD to work out such problems."  (Ex. H to Stanton Decl.)  Dr. Stanton denied Ferch's appeal, finding that Ferch received the proper procedural protections and the involuntary medication was appropriate.  (Ex. H to Stanton Decl.; Stanton Decl. ¶¶ 18-19.)

### C. Litigation

Through the BCRC, Ferch brings the instant action under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), against Warden Jett, Dr. Hart, Dr. Stanton, and Banitt.  (*See* BCRC at 1.)    Ferch alleges that "the Warden of FMC [Rochester] and his staff officials [are] using BOP documents to commit fraud on [his] mental health patient medical records."  (BCRC at 1.)  Ferch also alleges that his due process rights were violated during the involuntary-medication proceedings.  (*See* BCRC at 1, 2, 3.)

Specifically, Ferch alleges that Banitt "produced" Notices containing a fraudulent statement of the reason for treatment, namely, that Ferch is gravely disabled and a danger to himself and others, and that Banitt knew the statement was fraudulent when she prepared the Notices.  (BCRC at 1.)

As for Dr. Stanton, Ferch alleges that Dr. Stanton signed the Notices containing the fraudulent reason for treatment, knowing it was fraudulent, and "did not interview [Ferch] to find out if it was a true statement or not that [he] was gravely disabled and [a] danger to [him]self and others."  (BCRC at 2.)

With respect to Dr. Hart, Ferch alleges that she is "making fraudulent medical reports" that he is in need of treatment, citing a previous declaration submitted by Dr.

Hart in this matter, (*see* ECF No. 20), and its accompanying exhibits, which primarily consist of the 2011, 2012, and 2013 Notices, Involuntary Medication Reports, and Due Process Reports as well as the related appeal materials.

Ferch alleges that the falsity of the statements is demonstrated by the several Work Performance Ratings he has submitted containing "outstanding work reviews." (BCRC at 2.) Ferch has appended his 2014 Work Performance Ratings to the BCRC. (Ferch Ex. H, ECF Nos. 40-2 at 1-4, 43-1 at 5-6; *see* Ltr. to Clerk of Court, Jan. 30, 2015, ECF No. 43-2 (stating August and September 2014 Work Performance Ratings should be included with June, July, October, and November 2014 Work Performance Ratings previously submitted as Exhibit H).) Additionally, Ferch alleges that he would not be able to complete the number of education courses he has "if [he] was severely mentally ill as is described by the FMC doctors in their fraudulent statements." (BCRC at 3.) In support of these allegations, Ferch has appended a copy of his transcript to the BCRC. (*See* Ferch Ex. I, ECF No. 43-1 at 4.)

Ferch alleges that he was not made aware of his legal rights and Dr. Hart, Dr. Stanton, and Banitt conspired together to commit fraud "upon [his] Due Process Hearing medical records and they did it three times of 2011, 2012, and 2013 in violation of [his] Due Process rights." (BCRC at 3.)

### III. PROCEDURAL ISSUES

#### A. Multiple Complaints & Multiple Motions to Dismiss

Since the filing of the BCRC, Ferch has filed two additional documents that could be considered amended pleadings, or attempts to amend his BCRC pleading. (*See* ECF

Nos. 77, 78.)   The documents came on the heels of Defendants' Amended Motion to Dismiss.   Thus, it appears that Ferch may have been trying to correct any perceived deficiencies in his BCRC by attempting to amend his pleading as a matter of course under Fed. R. Civ. P. 15(a)(1)(B), which permits a party to amend its pleading once as a matter of course "21 days after service of a motion under Rule 12(b), (e), or (f)."   Assuming the timely submission of these documents,[8] only one of them (ECF No. 77) is a pleading and, in fact, is the same as the BCRC.[9]   The second document, "Amended Plaintiff's Opposing Fraud Complaint," (ECF No. 78), appears to be asserting additional factual allegations in response to Defendants' Amended Motion to Dismiss and, thus, under the liberal construction afforded to pro se litigants, is construed as a motion for leave to amend to file a second amended pleading including those factual allegations.   *See Baldwin v. Credit Based Asset Servicing & Securitization*, 516 F.3d 734, 738 (8th Cir. 2008) ("Pro se motions are, however, to be construed liberally." (citing *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004); *Miller v. Norris*, 247 F.3d 736, 739 (8th Cir. 2001)).

Following the filing of these documents, however, Defendants filed another motion to dismiss, Defendants' Motion to Dismiss Amended Complaint (Docket Nos. 63 and 77) (ECF No. 79).   In this motion to dismiss, Defendants have construed together the

---

[8] Defendants' Amended Motion to Dismiss was mailed to Ferch on May 26, 2015.  (ECF No. 72.)  The documents at issue were mailed on June 18 or 19, and received by the Court on June 22.  (*See* ECF Nos. 77, 77-3, 78, 78-1.)  In the intervening time between the filing of the motion to dismiss and the Court's receipt of these documents, the Court issued a Case Management Order Regarding Defendants' Amended Motion to Dismiss (ECF No. 75) on June 3, directing Ferch to submit a response by June 24.

[9] When Ferch filed the BCRC, he included additional Work Performance Ratings to be considered along with his previously submitted Exhibit H.  These were not attached to the "duplicate" document, but, as this Court has previously stated, *see supra* n.3, the Court has considered Ferch's exhibits collectively given his pro se status and his statements incorporating by reference previously filed documents.

duplicate pleading and a document filed by Ferch entitled, "Plaintiff's Rebuttal to Government's Motion to Dismiss the Case" (ECF No. 63), and argue that "[t]hese amended pleadings have not alleviated the fatal defects of Ferch's original *Bivens*-style complaint." (Defs.' Mem. in Supp. of Mot. to Dismiss at 1, ECF No. 80; *see also* Defs.' Mem. in Supp. of Mot. to Dismiss at 4 ("The defense has previously presented extensive arguments regarding both the lack of subject matter jurisdiction over the complaints made by Ferch, and his failure to state a claim upon which relief may be granted. Ferch's amended complaint has not cured these defects, so these claims must be dismissed under Fed. R. Civ. P. 12(b)(6) and 12(b)(1)." (citation omitted)).)

For the reasons stated in the next section, the Court has construed Defendants' motions to dismiss as motions for summary judgment and has considered Ferch's submissions as a collective response to these motions in light of his pro se status.

### B.   Conversion to Motion for Summary Judgment

In their motions to dismiss, Defendants rely on "declarations containing factual allegations relating to their various defenses." (Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 4, ECF No. 67; *see, e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss at 6-10.) As Defendants correctly recognize, "[i]f, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see Hearing v. Minn. Life Ins. Co.*, 793 F.3d 888, 893 (8th Cir. 2015) ("Under Federal Rule of Civil Procedure 12(d), a motion to dismiss must be treated as one for summary judgment if the court considers matters outside the pleadings that were presented by the movant");

27

*Thornberg v. State Farm Fire & Cas. Co.*, No. 14-cv-122 (SRN/JJK), 2015 WL 3612550, at *2 (D. Minn. June 9, 2015), *appeal filed*, No. 15-2526 (8th Cir. July 16, 2015).  (Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 4.)   "Most courts view matters outside the pleading as including any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings."  *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992) (quotation omitted); *accord Thornberg*, 2015 WL 3612550, at *2; *Machen v. Iverson*, No. 11-cv-1557 (DWF/JSM), 2012 WL 566977, at *12 (D. Minn. Jan. 23, 2012), *adopting report and recommendation*, 2012 WL 567128 (D. Minn. Feb. 21, 2012).  "Courts have discretion to decide whether to accept material outside the pleadings that is offered in conjunction with a Rule 12(b)(6) motion."  *Thornberg*, 2015 WL 3612550, at *2 (citing *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003)); *accord Machen*, 2012 WL 566977, at *12.

When a court treats a motion to dismiss as a motion for summary judgment, Fed. R. Civ. P. 12(d) requires that the parties 'must be given a reasonable opportunity to present all material that is pertinent to the motion.'"  *Thornberg*, 2015 WL 3612550, at *2; *accord Machen*, 2012 WL 566977, at *12.  "Where the movant designates its motion to dismiss alternatively as a motion for summary judgment, and the nonmovant submits materials outside the pleadings, a district court is not required to give formal notice that it will treat a motion as one for summary judgment."  *Hearing*, 793 F.3d at 893; *accord Machen*, 2012 WL 566977, at *12 ("The Eighth Circuit has held that 'parties have constructive notice that the court will treat the motion as one for summary judgment

when the moving party states that it is moving for summary judgment and the parties submit and refer to materials outside the complaint.'" (quoting *Riehm v. Engelking*, 538 F.3d 952, 962 n.5 (8th Cir. 2008))); *see also Thornberg*, 2015 WL 3612550, at *2.

> Examples where a party has been deemed to have received constructive notice that a motion to dismiss may be converted to a Rule 56 motion include when [the] opposing party had the opportunity to file an amended complaint before the court ruled on the motion and had substantial time to respond to the motion, or when the opposing party acknowledged the outside materials in responsive papers, or has submitted papers outside the complaint for consideration.

*Machen*, 2012 WL 566977, at *12 (citation omitted). In "case[s] involving a *pro se* party, the Court must proceed with caution in converting a motion to dismiss to a motion for summary judgment." *Id.*; *see Thornberg*, 2015 WL 3612550, at *2.

Here, Ferch has submitted numerous exhibits. While the majority of these exhibits were submitted in connection with his initial pleading, *see supra* n.3, Ferch specifically incorporated these exhibits into the BCRC. (BCRC at 3 ("I, Harley Ferch[,] incorporate all pleadings and exhibits already on the record as is set forth herein."). Ferch's exhibits, therefore, are not matters outside the pleadings. *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) ("[D]ocuments 'necessarily embraced by the complaint' are not matters outside the pleading."); *see Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (exhibits attached to pleadings may be considered on motion to dismiss). Defendants have submitted declarations from Banitt, Dr. Hart, and Dr. Stanton with accompanying exhibits. Several of these exhibits overlap with Ferch's exhibits, namely, copies of the 2011, 2012, 2013 Notices, (*compare* Ferch Ex. E, ECF

No. 5-1 at 2-4, *with* Exs. A, C to Banitt Decl.; Exs. C, F, I to Stanton Decl.), and the 2011

Due Process Report, (*compare* Ferch Ex. F, ECF No. 5-1 at 6-8, *with* Ex. D to Banitt

Decl.; Ex. D to Stanton Decl.).  But the declarations themselves and other exhibits are

matters outside the pleadings.

In their first motion to dismiss, Defendants presented matters outside the pleadings

and "discussed summary judgment as an alternative to [their] motion to dismiss."

*Machen*, 2012 WL 566977, at *13; *see Thornberg*, 2015 WL 3612550, at *2-3 (finding

constructive notice where defendants' motion to dismiss included alternate remedy of

summary judgment in title, accompanying memorandum discussed both legal standards,

and defendants submitted a declaration with exhibits along with memorandum).  (*See*

Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 5-6.)  Given Defendants' submission of

the declarations of Banitt, Dr. Hart, and Dr. Stanton and their accompanying exhibits,

"[Defendants'] explicit references to summary judgment in [their principal]

memorandum, and [their] recitation of the summary judgment standard requiring the

opposing party to set forth specific facts showing that there is a genuine issue for trial,"

Ferch had "constructive notice that [Defendants] w[ere] asking the Court to convert

[their] motion to dismiss to a motion for summary judgment."  *Machen*, 2012 WL

566977, at *13; *see Hearing*, 793 F.3d at 893.  Ferch responded to the motion by not only

filing an opposition referencing his own previously filed exhibits, (Plaintiff's Big

Objection to Defendant's Am. Mot. to Dismiss ("Pl.'s Obj."), ECF No. 76), he also filed

the "Amended Plaintiff's Opposing Fraud Complaint," which the Court has construed as

seeking to amend the BCRC in response to Defendants' motion.

Following these submissions, Defendants again moved for dismissal. (*See* Defs.' Mot. to Dismiss Pl.'s Am. Compl. (Docket Nos. 63 and 77).) Defendants relied substantially on the arguments made in their first motion and responded to Ferch's proposed amendments. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss at 1, 4.) Ferch again had the opportunity to respond to Defendants' arguments and did so. (Pl.'s Objection to Defense's Mem. in Supp. of Mot. to Dismiss Pl.'s Am. Compl. As Is ("Pl.'s Obj. to Defense Mem."), ECF No. 82.)

Based on the foregoing, the Court concludes that Ferch had constructive notice that Defendants were asking the Court to convert their motions to dismiss into motions for summary judgment and Ferch had a reasonable opportunity—several in fact—to present all pertinent material in response. *See Hearing*, 793 F.3d at 893; *Thornberg*, 2015 WL 3612250, at *2-3; *Machen*, 2012 WL 566977, at *12-13. Therefore, the Court treats Defendants' motions to dismiss as motions for summary judgment.

## IV. ANALYSIS

### A. Legal Standard

"Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Smith v. Securus Techs., Inc.*, No. 15-cv-550 (SRN/HB), ___ F. Supp. 3d ____, 2015 WL 4636696, at *3 (D. Minn. Aug. 4, 2015) (citing Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). "The moving party bears the burden of establishing a lack of genuine issue of fact." *Brunsting v. Lutsen*

31

*Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 323); *accord Smith*, 2015 WL 4636696, at *3.  At the same time, "the nonmoving party 'may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'"  *Brunsting*, 601 F.3d at 820 (quoting *Anderson*, 477 U.S. at 256); *accord Smith*, 2015 WL 4636696, at *3.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.'"  *Smith*, 2015 WL 4636696, at *3 (quoting *Anderson*, 477 U.S. at 248).  Additionally, "summary judgment is properly entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322); *see also Brunsting*, 601 F.3d at 820 ("[I]f a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate.").

As best as this Court is able to tell, Ferch asserts the following claims: (1) Banitt, Dr. Hart, and Dr. Stanton made fraudulent statements in Ferch's medical records in order to involuntarily medicate him, (*see* BCRC at 1, 2, 3); (2) Ferch's due-process rights were violated during the involuntary-medication proceedings (*see* BCRC at 1, 2, 3); and (3) Banitt, Dr. Hart, and Dr. Stanton conspired with one another to violate Ferch's due-process rights as proscribed by 18 U.S.C. § 241 (conspiracy against rights).  *See Stone*,

364 F.3d at 914 ("pro se complaints are to be construed liberally").  Warden Jett will be addressed separately.  Defendants have moved for summary judgment on all claims.

### B.  Criminal Conspiracy

Ferch alleges that Dr. Hart, Dr. Stanton, and Banitt "all worked together in a conspiracy to commit fraud upon my Due Process Hearing medical records and they did it three times of 2011, 2012, and 2013 in violation of my Due Process rights and 18 U.S.C. s/s 241."  (BCRC at 3.)  Defendants assert that Ferch cannot bring a civil action under 18 U.S.C. § 241, a criminal statute.  (Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 15-16.)

In relevant part, section 241 makes it a crime for "two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same."  18 U.S.C. § 241.  Section 241 is a federal criminal statute and does not "provide [a] basis for any private cause of action by [Ferch] against the named Defendants."  *Roberson v. Pearson*, No. 12-cv-2056 (ADM/FLN), 2012 WL 4128303, at *1 (D. Minn. Aug. 27, 2012) (citing cases), *adopting report and recommendation*, 2012 WL 4128293 (D. Minn. Sept. 18, 2012); *see, e.g.*, *United States v. Wadena*, 152 F.3d 831, 846 (8th Cir. 1998) ("Courts repeatedly have held that there is no private right of action under § 241, even though the statute allows federal authorities to pursue criminal charges."); *Johnson v. Williams*, 699 F. Supp. 2d 159, 164 n.5 (D. D.C. 2010) ("The Court summarily dismisses the plaintiff's claims

under 18 U.S.C. §§ 241 and 242 (2000), as there is no private right of action under these criminal statutes." (citing cases)).

Accordingly, the Court recommends that judgment be entered in favor of Banitt, Dr. Hart, and Dr. Stanton on Ferch's claims brought under 18 U.S.C. § 241 because this criminal statute does not provide a private right of action.

### C. Constitutional Claims Based on Involuntary Medication

"A *Bivens* action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors." *Aldaco v. Holder*, No. 10-cv-590 (JRT/LIB), 2011 WL 825624, at *3 (D. Minn. Jan. 7, 2011) (citing 403 U.S. at 395-97), *adopting report and recommendation*, 2011 WL 839388 (D. Minn. Mar. 7, 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("In *Bivens* . . . this Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). "A *Bivens* claim allows a plaintiff to bring an action for money damages against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct." *Aldaco*, 2011 WL 825624, at *3 (citing 403 U.S. at 395-97); *see Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 812 (8th Cir. 2008) ("*Bivens* allows for a cause of action for damages against federal officials, not federal agencies, for certain constitutional violations."). "A plaintiff asserting a claim under *Bivens* must show the violation of a valid constitutional right by a person acting under color of federal law." *Aldaco*, 2011 WL 825624, at *3 (citing 403 U.S. at 395-97). "As a general rule, *Bivens* claims and § 1983 claims are almost identical and involve the

34

same analysis." *Solomon v. Petray*, 795 F.3d 777, 789 n.7 (8th Cir. 2015) (citing *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999); *Duffy v. Wolle*, 123 F.3d 1026, 1037 (8th Cir. 1997)).

### 1. Right Not to Be Involuntarily Medicated

As an initial matter, Defendants assert that they are entitled to qualified immunity because the Eighth Circuit has held that the right not to be involuntarily medicated is not a clearly established constitutional right, citing *Papantony v. Hedrick*, 215 F.3d 863 (8th Cir. 2000) (per curiam).

"The Supreme Court has recognized that 'an individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs—an interest that only an essential or overriding state interest might overcome.'" *Meyers v. Health & Hosp. Corp.*, No. 13-CV-1258 (CBA) (LB), 2014 WL 4160796, at *4 (E.D. N.Y. Mar. 28, 2014) (quoting *Sell v. United States*, 539 U.S. 166, 178-79 (2003)) (internal quotation marks omitted), *adopting report and recommendation*, 2014 WL 4161975 (E.D. N.Y. Aug. 19, 2014); *see United States v. Hardy*, 724 F.3d 280, 295 (2d Cir. 2013) ("'The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.'" (quoting *Washington v. Harper*, 494 U.S. 210, 229 (1990))).  While not having addressed this right in the context of civil commitment, the Supreme Court has addressed it in the context of federal inmates. *Disability Rights New Jersey, Inc. v. Comm'r, New Jersey Dep't Human Servs.*, 796 F.3d 293, 296 (3d Cir. 2015) (citing *Harper*, 494 U.S. 210); *accord Meyers*, 2014 WL 4160796, at *4.  "The propriety of forcibly medicating federal inmates is governed

by the principles set forth in *Washington v. Harper*, and by regulations adopted by the Bureau of Prisons." *United States v. McAllister*, Civil No. 493836-DSD/JMM, 969 F. Supp. 1200, 1204 (D. Minn. 1997) (citation omitted). "[I]n *Harper*, . . . the Supreme Court held that the Due Process Clause permits the forcible administration of antipsychotic drugs to a mentally ill inmate 'if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.'" *Meyers*, 2014 WL 4160796, at *4 (quoting 494 U.S. at 227). "Courts have extended this standard to involuntary medication in the civil commitment context." *Id.*; *see Disability Rights New Jersey*, 796 F.3d at 296 (describing *Harper* as "the most relevant" for forcible medication of civilly committed individuals in state custody); *United States v. Hardy*, 724 F.3d 280, 295-97 (2d Cir. 2013) (applying *Harper* to involuntary medication of federal detainee); *United States v. Loughner*, 672 F.3d 731, 744 (9th Cir. 2012) ("[W]e hold that the standard announced in *Harper* applies with equal force in the context of pretrial detainees."); *McAllister*, 969 F. Supp. at 1204-05, 1206-07 (applying *Harper* to involuntary medication of person committed under 18 U.S.C. § 4246).

Returning to *Papantony*, Papantony, a federal detainee, "was found incompetent to stand trial and was committed to a federal mental health center," where he was "treated against his will with antipsychotic drugs" in order to render him *competent to stand trial*. 215 F.3d at 864-65. Citing both the majority and concurring opinions in *Riggins v. Nevada*, 504 U.S. 127 (1992), the Eighth Circuit held that "the constitutional right [not to be forcibly administered antipsychotic drugs] is far from clearly established. In fact, Papantony, as a pre-trial detainee likely has no substantive due process right not to be

forcibly administered antipsychotic drugs to render him competent for trial." *Papantony*, 215 F.3d at 865.

Three years later, in *Sell*, the Supreme Court "set out the substantive standards for when the government may administer antipsychotic drugs involuntarily to a mentally ill criminal defendant to render him competent for trial." *Loughner*, 672 F.3d at 747 (citing 539 U.S. 166); *see Sell*, 539 U.S. at 179 ("These two cases, *Harper* and *Riggins*, indicate that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."). *Sell* "adopted a more demanding standard for medicating a defendant facing trial to render that defendant competent than it required in *Harper* for medicating a convicted inmate to render that inmate nondangerous." *Loughner*, 672 F.3d at 747.

In this case, medication is not being involuntarily administered in order to render Ferch competent for trial. Ferch has been civilly committed pursuant to 18 U.S.C. § 4246 (hospitalization of a person due for release but suffering from mental disease or defect). The Court declines to comment on whether *Papantony* continues to remain good law in light of *Sell*. In any event, the reason for the involuntary medication of Ferch distinguishes this case from *Papantony*. Therefore, when analyzing the issues in this case, the Court is guided by the Supreme Court's recognition in *Harper* of an individual's

"significant liberty interest in avoiding the unwanted administration of antipsychotic drugs."  494 U.S. at 221.  Having recognized that Ferch has a significant liberty interest in avoiding the unwanted administration of antipsychotic medication, the Court turns to Ferch's claims that records were falsified in order to medicate him and, consequently, whether there was deliberate indifference to his medical needs.

### 2.   Falsification of Medical Records/Deliberate Indifference

Ferch claims that Banitt, Dr. Stanton, and Dr. Hart falsified his medical records because he does not have a mental illness, is not gravely disabled, and is not a danger to himself or others.  The Court has construed the claims against these defendants as claims for deliberate indifference to his medical needs—albeit somewhat of an inverse from the typical deliberate-indifference claim in that Ferch claims that he is being involuntarily medicated, i.e., treated, for a medical condition that he does not have.[10]  *See Stone*, 364 F.3d at 914.

_____

[10] Defendants construe these claims as claims for "'pure' record falsification" and argue such claims are not actionable under the Privacy Act, *see* 5 U.S.C. § 552a (records on individuals), because Ferch has not exhausted his administrative remedies.  (Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 7; *see* Defs.' Mem. in Supp. of Mot. to Dismiss at 11.)  According to Defendants, this Court lacks subject-matter jurisdiction over the falsification claims.  (Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 7; Defs.' Mem. in Supp. of Mot. to Dismiss at 11.)  Defendants rely primarily on *Phillips v. Suvalsky*, No. 06-cv-406 (JMR/RLE), 2008 WL 5401659 (D. Minn. Dec. 22, 2008).  (Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 7.)  This Court appreciates that Defendants, like the Court, have had to attempt to place Ferch's pro se arguments within the proper legal framework.  This Court determines that Ferch's claims are fundamentally grounded in medical-treatment decisions and therefore considers the fraudulent-records allegations within the deliberate-indifference framework.  In any event, as stated in *Phillips*, "[t]he Privacy Act only provides civil remedies, whether monetary, declaratory, or injunctive, to Federal agencies, and *not against individuals*."  2008 WL 5401659, at *11 (emphasis added).  Ferch has not sued any federal agencies, only individuals.  Given that Ferch's records are likely maintained by the Bureau of Prisons ("BOP"), they may very well be exempt from the Privacy Act anyway.  *See* 28 C.F.R. § 16.97 (listing BOP records systems exempt from the Privacy Act, including the Inmate Physical and Mental Health Record System); *Jackson v. U.S. Dep't of Justice*, No. 09-cv-0846 (JRT/JJK), 2009 WL 5205421, at *4 (D. Minn. Dec. 23, 2009) ("The first and third of these allegations are insufficient to state a claim under the Privacy Act because the BOP's regulations exempt presentence reports from the Act's provisions that permit civil suits to enjoin the amendment of agency records."); *FMC Rochester*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/rch/ (January 28, 2016) (describing BOP facility FMC Rochester as "[a]n administrative security federal medical center").

38

### a. Deliberate-Indifference Claims Arise Under the Fifth Amendment Rather Than the Eighth Amendment

Ferch has been civilly committed by the federal government; he is not a prisoner. "If *a prisoner* claims that he has been denied proper medical care, his claim normally will be brought under the Eighth Amendment." *Lee v. Klingaman*, No. 13-cv-799 (PJS/FLN), 2013 WL 1900564, at *3 (D. Minn. Apr. 18, 2013) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)), *adopting report and recommendation*, 2013 WL 1900561 (D. Minn. May 7, 2013). Because Ferch is a civilly committed detainee, his deliberate-indifference claims "cannot be brought directly under the Eighth Amendment." *Id.* (citing *Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("because an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for purposes of punishment following conviction, the Eighth Amendment does not apply")); *see Moyle ex rel. Repp v. Anderson*, No. 07-cv-848 (RHK/RLE), 2008 WL 4613751, at *4 (D. Minn. Oct. 15, 2008) ("[T]he conditions and restrictions of confinement for pre-trial detainees are analyzed under the Due Process Clauses of the Fifth and Fourteenth Amendments, not the Eighth Amendment.").

"[W]hile civilly committed detainees are not directly protected by the Eighth Amendment, the due process clause affords them the same protections that prisoners receive under the Eighth Amendment." *Lee*, 2013 WL 1900564, at *3 (deliberate-indifference claim by civilly committed detainee in state custody cognizable under Fourteenth Amendment's due process clause); *accord Moyle*, 2008 WL 4613751, at *4 ("[T]he Eighth Circuit has stated that for pre-trial detainees, courts should apply the

identical deliberate-indifference standard as that applied to conditions-of-confinement claims made by convicts." (quotation omitted)); *see Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D. N.Y. 2013) ("A convicted prisoner's claim is analyzed under the Eighth Amendment. In the case of a pretrial detainee, the same claim is analyzed under the Due Process Clauses of the Fifth Amendment for federal detainees and the Fourteenth Amendment for state detainees." (citation omitted)); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("We have often applied the Eighth Amendment deliberate indifference test to pretrial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment. We see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment." (citation omitted)). As a federal civilly committed detainee, Ferch's "constitutional challenge to the adequacy of his medical care must be brought under the [Fifth] Amendment's due process clause, but analyzed using apposite Eighth Amendment precepts." *Lee*, 2013 WL 1900564, at *3; *accord Cuoco*, 222 F.3d at 106; *Moyle*, 2008 WL 4613751, at *4; *cf. Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014) ("[W]here a patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment.").

### b. Deliberate Indifference

"Deliberate indifference has both an objective and a subjective component." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009); *accord Scott*, 742 F.3d 339-40. "The objective component requires a plaintiff to demonstrate an objectively serious medical need." *Vaughn*, 557 F.3d at 908; *accord Scott*, 742 F.3d at 340. "A medical need is

objectively serious if it either has been diagnosed by a physician or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Scott*, 742 F.3d at 340 (quotation omitted); *accord Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006) ("Under the first prong of the deliberate indifference standard, an objectively serious medical need or a deprivation of that need must be either obvious to the lay person or supported by medical evidence, like a physician's diagnosis." (quotation omitted)). "The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Vaughn*, 557 F.3d at 908; *accord Scott*, 742 F.3d at 340. "This showing requires a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Scott*, 742 F.3d at 340 (quotation omitted). "A mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation." *Scott*, 742 F.3d at 340 (quotation omitted); *accord Lee*, 2013 WL 1900564, at *4 ("[I]t bears repeating that an inmate cannot bring an Eighth Amendment deliberate indifference claim simply because he disagrees with his medical treatment.").

### i.      Serious Medical Need

Ferch states that he does not have a mental illness and his records were falsified to state that he does. Relying on the records of Dr. Bocanegra, Ferch asserts that Dr. Bocanegra "has already made the diagnosis that Ferch has no symptoms of mental illness and has no symptoms of psychosis." (Pl.'s Rebuttal at 1, ECF No. 63 (citing Ferch Ex. B at 6-13, ECF No. 1-1); *accord* Pl.'s Rebuttal at 2, 3; Pl.'s Obj. at 1.)  While often difficult to read, Dr. Bocanegra's records do note that Ferch has "no active symptoms of mental

41

illness," (Ferch Ex. B at 6; *accord* Ferch Ex. B at 7, 9, 11, 13), and there was "no evidence of violent behavior," (Ferch Ex. B at 6). *Significantly, however, these records are from 2008.* (*See* Ferch Ex. B at 6-13.) Ferch's lawsuit concerns acts that took place between 2011 and 2013. As such, Dr. Bocanegra's notes do not address Ferch's mental health during the relevant period of time. Moreover, Dr. Bocanegra noted that Ferch was *compliant* with his medications at the time. (*See* Ferch Ex. B at 7; Defs.' Mem. in Supp. of Mot. to Dismiss at 6-7.) When asked by Dr. Bocanegra whether Ferch had a mental illness, Ferch responded, "[N]ot at this time b[ecause] I'm taking my medications." (Ferch Ex. B at 6.) Ferch also relies on his positive Work Performance Ratings from 2011, 2012, 2013, and 2014, and his transcript of completed education courses. (BCRC at 2, 3; Pl.'s Rebuttal at 1; Pl.'s Obj. at 1; Ferch Exs. G, H, I; *see* Am. Pl.'s Opposing Fraud Compl. at 1.) But these documents too do not constitute medical evidence of Ferch's mental health during the relevant time. In sum, Plaintiff has presented no medical evidence in support of his assertion that he was not suffering from a mental illness during the relevant time.

Likewise, Ferch's self-diagnosis that he does not suffer from a mental illness and does not need medication is insufficient. *See Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) ("Kayser's self-diagnosis alone cannot establish that he does, in fact, suffer from kidney stones and the available medical evidence does not support his self-diagnosis."); *Roberson v. Goodman*, 293 F. Supp. 2d 1075, 1081 (D. N.D. 2003) (inmate's "self-serving, non-medical diagnosis" was "[in]sufficient to sustain his burden of proof"). The record shows that Ferch has a lengthy history of delusional disorder with

diagnoses dating at least back to 1990, including diagnoses of "Delusional Disorder, Paranoid Type; Schizophrenia, Paranoid Type; Paranoid Personality Disorder; and Narcissistic Personality Disorder" in 1990 through the Florida Department of Corrections. (2011 Due Process Report at 1; *accord* 2012 Due Process Report at 2; 2013 Due Process Report at 1-2.) In 1997, the Medical Center for Federal Prisoners in Springfield, Missouri, diagnosed Ferch with "Delusional Disorder, Paranoid Type." (2011 Due Process Report at 1; *accord* 2012 Due Process Report at 2; 2013 Due Process Report at 2.) Dr. Bocanegra's notes also reference delusional disorder. (Ferch Ex. B at 9, 11, 13.)

In her declaration, Dr. Hart, Ferch's treating psychiatrist from 2011 through 2013, states:

> Based on my training and clinical experience, Mr. Ferch meets the criteria for a diagnosis of Delusional Disorder, Mixed Type, which is the presence of one or more delusions that persist for at least one month with no one predominant delusional theme. His delusional themes focus on being an investigator for government agencies, corporations, police departments, and private individuals; the existence of a conspiracy to cover up police corruption he uncovered; and the existence of conspiracies to civilly commit him and involuntarily treat him with antipsychotic medication. Specifically, he believes he "recovered" from his mental illness when his criminal charges were dismissed, and therefore, does not need antipsychotic medication.

(Hart Decl. ¶ 5.) Among other examples, Dr. Hart states that

> Mr. Ferch has acted in furtherance of his delusional belief he is an investigator. . . . [H]e reports that he sends letters demanding U.S. Attorneys pursue grand jury indictments into alleged corruption Mr. Ferch has uncovered. When no grand

> jury indictments are issued, Mr. Ferch then focuses on having
> the U.S. Attorneys disbarred.

(Hart Decl. ¶ 6.)  Dr. Hart also states that "Mr. Ferch routinely shows staff documents he believes prove he does not have a mental illness.  In reality, the documents reflect periods of mental stability when he was compliant with medication."  (Hart Decl. ¶ 7.)  In 2011, 2012, and 2013, the hearing psychiatrist, Dr. Maldonado, agreed with Dr. Hart that Ferch suffered from delusional disorder.  (2011 Due Process Report at 2; 2012 Due Process Report at 3; 2013 Due Process Report at 3-4.)

The record shows that, when Ferch was compliant with his medication, the symptoms of his mental illness decreased.  (Ferch Ex. B at 6, 7; 2011 Involuntary Medication Report at 3; 2011 Due Process Report at 3; *see* Ferch Ex. B at 8-13; 2012 Involuntary Medication Report at 3; 2012 Due Process Report at 2; 2013 Due Process Report at 2-3, 4.)  Ferch himself has even acknowledged as much.  (Ferch Ex. B at 6; 2011 Involuntary Medication Report at 3; 2011 Due Process Report at 3.)  Based on the foregoing, there is no support for Ferch's claim that, for the time periods relevant to this lawsuit, he was being involuntarily medicated for a mental illness that he did not have.

### ii.    Disregard of a Substantial Risk of Serious Harm

Ferch also has not shown that Banitt, Dr. Stanton, or Dr. Hart consciously disregarded a substantial risk of harm to him under the subjective prong.  *See Williams v. Kelso*, 201 F.3d 1060, 1066 (8th Cir. 2000).  "[T]he law requires that [Ferch] make a showing of subjective awareness by [FMC] officials of a '*substantial* risk' of '*serious* harm' to [him] in order to establish a . . . deliberate indifference cause of action."  *Id.* at

44

1065 (emphasis in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)).

"Deliberate indifference requires a highly culpable state of mind approaching actual

intent." *Lee*, 2013 WL 1900564, at *4 (quotation omitted).   This standard requires a state

of mind "that is 'more blameworthy than negligence.'"   *Williams*, 201 F.3d at 1065

(quoting *Farmer*, 511 U.S. at 835); *accord Popoalii v. Corr. Med. Servs.*, 512 F.3d 488,

499 (8th Cir. 2008) ("Deliberate indifference is akin to criminal recklessness, which

demands more than negligent misconduct.").   "For a claim of deliberate indifference, the

[individual] must show more than negligence, more even than gross negligence . . . ."

*Popoalii*, 512 F.3d at 499 (quotation omitted).   Officials must "kn[o]w that the [medical]

condition created an excessive risk to the inmate's health and then fail[] to act on that

knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

    Again, Ferch has failed to present any medical evidence that the involuntary

medication created "a substantial risk of harm to him; namely, that he has suffered or will

suffer *severe* adverse side effects from the prescribed antipsychotic medications."

*Roberson*, 293 F. Supp. 2d at 1081 (emphasis added).   At one point, Ferch states that the

"antipsychotic medications  . . . cause[] painful rib cage muscle spasms, nervous system

pains[,] and trembling of the body."   (Pl.'s Obj. at 1; *see* 2013 Involuntary Medication

Report at 4; 2013 Due Process Report at 1, 2, 4.)   The Court notes that, at the 2013

hearing, Ferch's roommate stated that he had observed "medication side effects such as

shakiness when [Ferch] is lying down."   (2013 Involuntary Medication Report at 4;

*accord* 2013 Due Process Report at 1.)   "Tardive dyskinesia (a movement disorder) . . ."

is a potential side effect of olanzapine.   *Olanzapine,* PubMed Health, Nat'l Ctr. for

Biotechnology     Info.,     http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011473/
?report=details (last visited January 27, 2016).  But, even if the Court were to assume that
the side effects Ferch experienced constituted serious medical needs, Ferch was
encouraged to discuss them with Dr. Hart so that they could be addressed, (2013 Due
Process Report at 4).

With respect to Banitt, Ferch contends that she knew Ferch was not suffering from
a mental illness when she prepared the Notices for the involuntary-medication
proceedings.  Ferch "contends she had to know of such fraud handling the documents I
seen she got."  (Am. Pl.'s Opposing Fraud Compl. at 2.)  Ferch does not identify what
documents these are.  Fundamentally, Banitt's role was purely clerical. (*See* Banitt Decl.
¶ 3; Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 14.)  *See Green v. Dormire*, No. 08-
4047-CV-C-NKL, 2009 WL 813972, at *3 (W.D. Mo. Jan. 27, 2009) ("Plaintiff's claims
do not support that these defendants played a role in the decision-making process about
whether to medicate plaintiff.   Personal involvement in the alleged constitutional
deprivation is required to support an action under 42 U.S.C. § 1983.   In this case the
constitutional deprivation is the decision to involuntarily medicate plaintiff, not the
actions of those who simply carried out or assisted with the process of enforcing the
decision." (citation omitted)), *adopting report and recommendation*, 2009 WL 813780
(W.D. Mo. Mar. 26, 2009).  She was not involved with Ferch's treatment.  (*See* Banitt
Decl. ¶ 3, 4.)  Ferch appears to recognize as much.[11]  (Am. Pl.'s Opposing Fraud Compl.

---

[11] The Court will discuss Ferch's due-process claims related to Banitt's participation in the involuntary-medication proceedings themselves in the following section.

at 2 ("[Banitt's] job may have been clerical . . . .").)  Ferch has not made a sufficient showing that Banitt was aware of his mental-health status and that, in preparing the Notices, she was recklessly disregarding a substantial risk of serious harm to Ferch.

As for Dr. Stanton, Ferch contends that she did not interview him to determine if he was actually suffering from a mental illness and in need of medication.  (BCRC at 2; Pl.'s Rebuttal at 2; Am. Pl.'s Opposing Fraud Compl. at 1, 2.)  Dr. Stanton is also not involved in Ferch's treatment, although she did review the involuntary-medication determinations to verify "the justification for administering the medication was appropriate."  (Stanton Decl. ¶¶ 3, 10.)  Ferch has not made a sufficient showing that Dr. Stanton was aware of a serious medical need and recklessly disregarded a substantial risk of serious harm to Ferch by not interviewing him before denying his appeals.   At best, Ferch's argument is that Dr. Stanton should have been more thorough when reviewing his appeals.  Carelessness or negligence, however, is not sufficient to sustain a deliberate-indifference claim.  *Scott*, 742 F.3d at 340; *Popoalii*, 512 F.3d at 499; *Williams*, 201 F.3d at 1065.  Nor is Ferch's disagreement with Dr. Stanton's conclusion that involuntary medication is appropriate.  *Scott*, 742 F.3d at 340; *Long*, 86 F.3d at 765.

As for Dr. Hart, Ferch's treating psychiatrist, there is no evidence demonstrating that, in pursuing involuntary medication, Dr. Hart demonstrated deliberate indifference to Ferch's health or safety.  *Bradley v. Goins*, 2013 WL 4809293, at *7 (W.D. Wash. Sept. 9, 2013) ("However, the record contains no evidence demonstrating that defendant Goins[], in preparing her involuntary antipsychotic reports pursuant to DOC policy, demonstrated any deliberate indifference to plaintiff's health or safety.").  "In fact, the

evidence in the record supports the opposite conclusion; *i.e.*, that [Dr. Hart's] intent was to aid [Ferch] in managing his mental illness . . . ." *Id.*; *see Long*, 86 F.3d at 765 ("In fact, the record is full of evidence of the attempts of the prison medical staff to evaluate Long's psychological problems and Long's refusal to cooperate."); *Lee*, 2013 WL 1900564, at *4 ("To the contrary, Plaintiff's submissions show that Klingaman (and others at MSOP) have been consistently responsive to Plaintiff's medical concerns.").

It is clear that Ferch strongly disagrees with the medical treatment he received at FMC Rochester and believes that medication was unnecessary.   Exercising her professional judgment, Dr. Hart determined Ferch had a medical need, delusional disorder, which required medical treatment, namely, medication.   "[N]othing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment." *Long*, 86 F.3d at 765.  The same is true here.  Dr. Hart did not violate Ferch's constitutional rights when, "in the exercise of [her] professional judgment, [she] refuse[d] to implement [Ferch's] requested course of treatment." *Id.*  Ferch's difference of opinion with Dr. Hart's diagnosis and decision to pursue involuntary medication does not rise to the level of a constitutional violation. *Scott*, 742 F.3d at 340; *Vaughn*, 557 F.3d at 909; *Lee*, 2013 WL 1900564, at *4; *accord Downs v. Meyers*, No. 10-CV-203 (TJM/DRH), 2012 WL 1014829, at *8 (N.D. N.Y. Feb. 17, 2012) (inmate's disagreement with mental-illness diagnosis and proposed treatment did not constitute deliberate indifference), *adopting report and recommendation*, 2012 WL 996785 (N.D. N.Y. Mar. 23, 2012); *Gonzales v. Carpenter*, No. 9:08-CV-629 (LEK/ATB), 2011 WL 768990, at *13 (N.D. N.Y. Jan. 3, 2011) ("In this case, plaintiff clearly disagreed with the medical judgment of

the OMH psychiatrists that he required mental health observation, treatment, and medication.  However, a difference of opinion between a prisoner and prison doctors regarding medical treatment does not, as a matter of law, constitute deliberate indifference."), *adopting report and recommendation*, 2011 WL 767546 (N.D. N.Y. Feb. 25, 2011); *see Roberson*, 293 F. Supp. 2d at 1082 ("At best, Roberson has merely raised questions in his mind concerning the medical judgments exercised by Dr. Goodman and other treating psychiatrists, in the diagnosis and treatment of Roberson's psychiatric condition.").

Based on the foregoing, Ferch has not shown that Banitt, Dr. Stanton, and Dr. Hart were deliberately indifferent to his medical needs and the Court recommends that summary judgment be entered in their favor on Ferch's claims that these defendants were deliberately indifferent to his medical needs.

### 3.  Due Process

Ferch claims that the involuntary-medication proceedings violated both his procedural and substantive due process rights.  As stated above, "[t]he Supreme Court has recognized that 'an individual has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs—an interest that only an essential or overriding state interest might overcome.'"  *Meyers*, 2014 WL 4160796, at *4 (quoting *Sell*, 539 U.S. at 178-79) (internal quotation marks omitted); *see Hardy*, 724 F.3d at 295.  "[I]n *Harper*, . . . the Supreme Court held that the Due Process Clause permits the forcible administration of antipsychotic drugs to a mentally ill inmate 'if the inmate is dangerous to himself or others and the treatment is in the inmate's medical

interest,'" and "[c]ourts have extended this standard to involuntary medication in the civil

commitment context." *Meyers*, 2014 WL 4160796, at *4 (quoting 494 U.S. at 227); *see*

*Disability Rights New Jersey*, 796 F.3d at 296; *Hardy*, 724 F.3d at 295-97; *Loughner*, 672

F.3d at 744; *McAllister*, 969 F. Supp. at 1204-05, 1206-07.  When evaluating due-process

claims,

> [t]he substantive issue involves a definition of the protected
> constitutional interest, as well as identification of the
> conditions under which competing state interests might
> outweigh it.  The procedural issue concerns the minimum
> procedures required by the Constitution for determining that
> the individual's liberty interest is actually outweighed in a
> particular instance.

*Harper*, 494 U.S. at 220 (quotation omitted); *accord Loughner*, 672 F.3d at 743.  "In

other words, the substantive issue is what factual circumstances must exist before the

government may involuntarily medicate [Ferch]; the procedural issue is whether the

government's nonjudicial process used to determine the facts was sufficient."  *Loughner*,

672 F.3d at 743-44 (quotation omitted); *see Harper*, 494 U.S. at 220 ("Restated in terms

of this case, the substantive issue is what factual circumstances must exist before the

State may administer antipsychotic drugs to the prisoner against his will; the procedural

issue is whether the State's nonjudicial mechanisms used to determine the facts in a

particular case are sufficient.").

### a.  Procedural Due Process

Ferch's involuntary-medication proceedings were conducted pursuant to

procedures set forth in Program Statement 6010.03, which mirror the requirements of 28

C.F.R. § 549.46(a).  These procedures been deemed to be consistent with *Harper* and the

requirements of due process. *See United States v. Mann*, 532 F. App'x 481, 487 n.4, 488 (5th Cir. 2013) (noting regulations contained in 28 C.F.R. § 549.43 were amended in 2011 and moved to 28 C.F.R. § 549.46 and "[t]he procedural safeguards outlined [in 28 C.F.R. § 549.43] remain in place for defendants the government seeks to forcibly medicate on dangerousness grounds" under 28 C.F.R. § 549.46(a)); *Loughner*, 672 F.3d at 736 n.1 ("The former § 549.43 is now contained in § 549.46."); *United States v. Morgan*, 193 F.3d 252, 263 (4th Cir. 1999) ("[U]nder *Harper*, the administrative safeguards contained in 28 C.F.R. § 549.93 and the availability of judicial review for arbitrariness adequately protect the due process rights of a pretrial detainee for whom treatment with antipsychotic medication is necessary because he poses a danger to himself or to others in the institutional setting."); *United States v. Humphreys*, 148 F. Supp. 2d 949, 953 (D. S.D. 2001) ("Since 28 C.F.R. § 549.43 is essentially identical to the policy analyzed in *Harper*, the Court finds that the provisions of section 549.43 comport with due process."); *McAllister*, 969 F. Supp. at 1207 ("The federal regulations at issue here provide the same procedural protections to inmates that were provided by the Washington prison policy considered and upheld in *Harper*. The procedures prescribed by the federal regulations conform with the requirements of the Due Process Clause." (citations omitted)).

As best as this Court is able to tell, Ferch raises five challenges to the procedures used in the 2011, 2012, and 2013 hearings: (1) he was not notified of his rights, (BCRC at 2; Am. Pl.'s Opposing Fraud Compl. at 2); (2) he was not provided with a qualified staff representative, (Pl.'s Rebuttal at 3); (3) his 2011 staff representative did not "review and

51

summarize his records with audio and videotape," (Am. Pl.'s Opposing Fraud Compl. at 1); (4) he was not advised of the findings and justifications for the involuntary-medication determinations, (Pl.'s Rebuttal at 3); and (5) he was not interviewed as part of the appeals process, (BCRC at 2; Am. Pl.'s Opposing Fraud Compl. at 2).

### i.  Advisement of Rights

Program Statement 6010.03 and section 549.46 require that Ferch be informed of certain hearing rights: "the right to appear at the hearing, to present evidence, to have a staff representative, to request witnesses, and to request that witnesses be questioned by the staff representative or by the person conducting the hearing."   28 C.F.R. § 549.46(a)(3).  (Program Statement 6010.03 § 7.)  Each of the Notices informed Ferch of these rights and included places where Ferch could designate witnesses and representation by a staff member.  (2011 Notice, 2012 Notice, 2013 Notice.)  Each of the Notices was signed by Banitt and contained the date and time the Notice was given to Ferch.  (2011 Notice, 2012 Notice, 2013 Notice; *see* Banitt Decl. ¶ 3.)  At no point did Ferch receive less than the 24-hours' notice required by 28 C.F.R. § 549.46(a)(2).  Ferch himself produced copies of the Notices, demonstrating that he in fact received them and was thus informed of his rights.  (Ferch Ex. E.)  Ferch cannot simply rest on a mere denial that such rights were not provided to him. *See Brunsting*, 601 F.3d at 820; *Smith*, 2015 WL 4636696, at *3.

### ii.  Staff Representative Matters

Program Statement 6010.03 and section 549.46 require that Ferch be provided with "qualified staff representati[on]."  28 C.F.R. § 549.46(a)(3) ("If the inmate does not

request a staff representative, or a staff representative with insufficient experience or education, or one who is not reasonably available, the institution mental health division administrator must appoint a qualified staff representative."). (Program Statement 6010.03 § 7.) Ferch contends that all three of his appointed staff representatives were not qualified and that his 2011 staff representative did not "review and summarize [Ferch's] records with audio and video tape." (Pl.'s Rebuttal at 3; Pl.'s Am. Fraud Compl. at 1.)

Beginning with the 2011 request that Ferch's records be summarized by audio and videotape by his staff representative, Ferch has provided no authority that such summarization was constitutionally required. "The acts required of the staff representative do not necessarily speak in terms of advocacy, but require that the staff representative facilitate the [individual's] presentation at the hearing and any appeal." *Loughner*, 672 F.3d at 763. Significantly, Ferch has not asserted that he did not have adequate access to his records or that his staff representative failed to assist him in presenting information contained in those records at the hearing. Ferch has only claimed that his records were not made available to him in a particular form. Accordingly, no procedural due process violation resulted from the staff representative's failure to summarize Ferch's records by audio and videotape.

Turning to the qualification of the staff representatives, "[i]nstitutional medical personnel . . . . may not blindly accept an [individual's] request for a particular staff representative or lack thereof." *Morgan*, 193 F.3d at 265. By requiring that a *qualified* staff representative be appointed, it is "ensur[ed] that [the individual] will not only have a representative, but that the representative in question will be one with sufficient

53

education and experience." *Id.* "The Supreme Court has held that providing a lay advisor who understands the psychiatric issues involved provides sufficient procedural protection." *Loughner*, 672 F.3d at 761; *see Harper*, 494 U.S. at 236 ("Given the nature of the decision to be made, we conclude that the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection."); *see also Loughner*, 672 F.3d at 764 ("[W]e question whether any representative appointed by BOP who is not qualified to make medical diagnoses or prescribe medication—or, at the least, qualified by training to know what medications are typically called for to treat serious mental illnesses—can meet the inmate's treating psychiatrist on a level field."); *Morgan*, 193 F.3d at 265 ("Although [the regulation] does not specify the requisite type or level of education and experience, we have no difficulty determining that, at the very least, the staff representative must have the ability to understand the psychiatric issues involved in the proceeding."). In this vein, courts have called into doubt the appointment of a licensed clinical social worker and correctional officer as qualified staff representatives when the record contained no evidence that the individuals had the requisite background to understand the psychiatric issues involved. *See Loughner*, 672 F.3d at 762 ("We do not doubt the ability of a[ licensed clinical social worker] to understand psychological issues in general, particularly those related to counseling and psychotherapy. What is less clear is whether a[ licensed clinical social worker] has the background necessary to challenge either the diagnosis or the medical regimen prescribed by a psychiatrist."); *Morgan*, 195 F.3d at 265-66 ("[T]here is no indication at all in the administrative record that [the correctional officer] had any education or experience in

the field of psychiatry, let alone sufficient education and experience to understand the psychiatric issues involved in the administrative proceeding.").

Ferch has had three staff representatives: a registered nurse in 2011, a psychologist in 2012, and a licensed social worker in 2013.   (2011 Notice; 2012 Notice; 2012 Involuntary Medication Report at 5; 2013 Notice.)   Each of these individuals was appointed by Dr. Stanton.  (2011 Notice, 2012 Notice, 2013 Notice.)  Ferch states:

> The institutional mental health division administrator must appoint a qualified staff representative but that did not happen on my case as for the 2011 hearing a nurse was appointed to represent me, and . . . the social worker was my representative for the second hearing in 2012 [sic] and the third [sic] representative was a new doctor . . . who did not have any knowledge of how to represent me for my third hearing so my due process rights were violated by lack of knowledge of these three staff representatives who were suppose[d] to represent me but could not do so because they were confused at how to do so!

(Pl's Rebuttal at 3.)  Defendants maintain that Ferch received the proper procedural protections and "has not provided any factual support for his conclusion that the representation provided was inadequate."  (Defs.' Mem. in Supp. of Mot. to Dismiss at 9; *see* Defs.' Mem. in Supp. of Am. Mot. to Dismiss at 12 ("The procedures outlined in federal regulation [sic] were followed in Ferch's case to the letter.").)  *See Loughner*, 672 F.3d at 773 (Wallace, J., concurring in part) ("I do not join in viewing the dearth of record on [the licensed clinical social worker's] qualifications to support the possibility of sending this case back to the district court.  Instead, I would view it as a reason to affirm because it means that Loughner has not met his burden to show the arbitrariness of the Bureau of Prison's decision.").

There is nothing in the record describing the qualifications of the staff representatives other than their titles.  (*See* 2011 Notice; 2011 Involuntary Medication Report at 5; 2011 Due Process Report at 1; 2012 Notice; 2012 Involuntary Medication Report at 5; 2012 Due Process Report at 1; 2013 Notice; 2013 Involuntary Medication Report at 5; 2013 Due Process Report at 1.)  While on the surface it appears that the psychologist was likely sufficiently qualified to understand the psychiatric issues at hand, the Court is concerned whether the registered nurse and licensed social worker were sufficiently qualified.  *See Loughner*, 672 F.3d at 762; *Morgan*, 193 F.3d at 265-66.  And, from the reports of the hearings, it appears that the staff representatives' involvement was generally limited to relaying statements and requests from Ferch.  (*See* 2011 Involuntary Medication Report at 5; 2011 Due Process Report at 1; 2012 Involuntary Medication Report at 5; 2012 Due Process Report at 1; 2013 Involuntary Medication Report at 5; 2013 Due Process Report at 1.)  The psychologist, however, presented some additional exhibits at Ferch's request.  (*See* 2012 Involuntary Medication Report at 5; 2012 Due Process Report at 5.)

The staff representative's "failure to present any affirmative evidence or question any of the evidence in support of involuntary medication may indicate that [the] representation was unqualified or procedural defective." *Loughner*, 672 F.3d at 764; *see Morgan*, 193 F.3d at 266 ("[The staff representative's] minimal participation during the administrative proceeding seems consistent with one who lacks a background in psychiatry because there is no evidence of any meaningful participation by [the staff representative] on [the detainee's] behalf.").  "Or, it may simply indicate that [the staff

56

representative] had nothing to say because the evidence was overwhelming that [the individual] required medication and that his prescriptions were standard protocol." *Loughner*, 672 F.3d at 764.

When viewed in the light most favorable to Ferch, there is a factual dispute as to whether the registered nurse, psychologist, and licensed social worker appointed to be Ferch's staff representatives were sufficiently qualified to assist him during the involuntary medication proceedings.   And, if they were not, whether Ferch was prejudiced as a result.  *See Morgan*, 193 F.3d at 267.  These individuals were appointed by Dr. Stanton and it was Dr. Stanton who was charged with ensuring that Ferch received the proper procedural protections.  Based on the foregoing, the Court cannot conclude that, as a matter of law, Ferch received qualified staff representatives.  Whether Dr. Stanton is nevertheless entitled to qualified immunity, however, will be further analyzed in Sections IV.C.3.a.v and vi *infra*.

### iii.    Findings & Justification

Program Statement 6010.03 and section 549.46 require that the psychiatrist conducting the hearing "prepare a written report regarding the initial decision" and that the initial decision report "be promptly provided" to the subject individual.  28 C.F.R. § 549.46(a)(8).   (Program Statement 6010.03 § 7.)   The individual must also be "informed that he/she may appeal [the initial decision report] to the institution's mental health division administrator."  28 C.F.R. § 549.46(a)(8).  (Program Statement 6010.03 § 7.)   Ferch states that he did not receive the findings and justifications for the involuntary-medication determinations.  (Pl.'s Rebuttal at 3.)  There were two documents

generated following each hearing, the Involuntary Medication Report and the Due Process Report. (*See* Banitt Decl. ¶ 5.) The Involuntary Medication Report has sections summarizing how notice of the hearing was provided and the evidence presented at the hearing and includes the hearing psychiatrist's findings and justification as well as the individual's right to appeal. (*See, e.g.*, 2011 Involuntary Medication Report.) The findings are presented in a checklist format and the justification section in paragraph form. (*See, e.g.*, 2011 Involuntary Medication Report at 6.) The Involuntary Medication Report is signed by the hearing psychiatrist. (*See, e.g.*, 2011 Involuntary Medication Report at 7.) The Due Process Report contains a more detailed discussion of the hearing procedures, the evidence presented, and the hearing psychiatrist's findings and justification. (*See, e.g.*, 2011 Due Process Report.)

Following each hearing, both documents, the Involuntary Medication Report and the Due Process Report, were provided to Ferch by Banitt. (Banitt Decl. ¶ 5; 2011 Involuntary Medication Report at 7; 2012 Involuntary Medication Report at 7; 2013 Involuntary Medication Report at 7.) The dates and times Banitt provided these documents to Ferch are included in the Involuntary Medication Reports themselves. (2011 Involuntary Medication Report at 7; 2012 Involuntary Medication Report at 7; 2013 Involuntary Medication Report at 7.) Ferch himself has included a copy of the 2011 Involuntary Medication Report along with his exhibits. (Ferch Ex. F.) Further, Ferch's appeals demonstrate that he received the documents. In the 2011 appeal, Ferch stated, "Page 6 in Justification section makes numerous false claims against me!" (Ex. B to Stanton Decl.) As part of his 2012 appeal, Ferch stated, "The Involuntary Medication

Report is falsified in many parts . . . ."  (Ex. E to Stanton Decl.)  And, in his 2013 appeal, Ferch stated "Section 4. Findings Part B is fraudulent on Page 6 where 5 boxes is [sic] checked off and below that is the Justification section where several lies are told about my present mental health status . . . ."  (Ex. H to Stanton Decl.)  Again, Ferch cannot simply rest on a mere denial that the hearing psychiatrist's findings and justifications for involuntary medication were not provided to him.  *See Brunsting*, 601 F.3d at 820; *Smith*, 2015 WL 4636696, at *3.

### iv.    Interview on Appeal

Lastly, Ferch contends that his due process rights were violated when Dr. Stanton did not interview him when reviewing his appeals.  (BCRC at 2; Am. Pl's Opposing Fraud Compl. at 1, 2.)  Neither Program Statement 6010.03 nor section 549.46 required Dr. Stanton to interview Ferch when reviewing his appeals.  Dr. Stanton was required to "review the initial decision and ensure that the inmate received all necessary procedural protections, and that the justification for administering psychiatric medication is appropriate."  28 C.F.R. § 549.46(a)(9).  (Program Statement 6010.03 § 7.)  Ferch has provided no authority that an interview was required.   Dr. Stanton reviewed each involuntary-medication determination and concluded that Ferch received the proper procedural protections and the justification for involuntary medication was appropriate. (Stanton Decl. ¶¶ 12-13, 15-16, 18-19.)  While a question exists as to whether Ferch's staff representatives were sufficiently qualified, Dr. Stanton was not required to interview Ferch as part of the appeals process.

### v.    Qualified Immunity

As state above, a genuine issue of material fact exists as to whether Ferch's staff representatives were sufficiently qualified.  "Qualified immunity[, however,] extends to *Bivens* actions and, if applicable, immunizes executive officials from a lawsuit."  *Patel*, 515 F.3d at 812 (citations omitted).  "Qualified immunity shields public officials from civil lawsuits when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Keil v. Triveline*, 661 F.3d 981, 985 (8th Cir. 2011) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  "Qualified immunity analysis requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Nord v. Walsh Cnty.*, 757 F.3d 734, 738 (8th Cir. 2014) (quotation omitted); *accord Keil*, 661 F.3d at 985.  "Unless both of these questions are answered affirmatively, [a federal actor] is entitled to qualified immunity."  *Nord*, 757 F.3d at 738; *accord Keil*, 661 F.3d at 985 ("If the answer to either question is no, then the agents are entitled to qualified immunity.").  "[C]ourts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'"  *Nord*, 757 F.3d at 738-39 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Assuming that Dr. Stanton's failure to appoint qualified staff representatives at each of the hearings violated Ferch's procedural due process rights, the Court turns to the second prong of the analysis: whether the qualifications required of staff representatives

were clearly established at the time Ferch's representatives were appointed.  "Qualified immunity analysis must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Williams v. Jackson*, 600 F.3d 1007, 1013 (8th Cir. 2010) (quotation omitted).   "The Supreme Court does not permit courts to define clearly established law at high levels of generality; the analysis must take into account the specific facts of each case."  *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015) (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).   "Clearly established law is not defined 'at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'"  *Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015) (quoting *Plumhoff*, 134 S. Ct. at 2023).

   "To be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Doby v. Hickerson*, 120 F.3d 111, 113 (8th Cir. 1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *accord Nord*, 757 F.3d at 739.  "A plaintiff need not show that the very action in question has previously been held unlawful, but he must establish that the unlawfulness was apparent in light of preexisting law."  *Ellison v. Lesher*, 796 F.3d 910, 914 (8th Cir. 2015) (internal quotation and citation omitted) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *accord Nord*, 757 F.3d at 739.  "'[E]xisiting precedent must have placed the statutory or constitutional question beyond debate.'"  *Nord*, 757 F.3d at 739 (quoting *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam)).  "'The salient question is whether the state of the law at the time of an incident provided fair warning to the

defendants that their alleged conduct was unconstitutional.'" *Ellison*, 796 F.3d at 914 (quoting *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quotations and alterations omitted)).

"'When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (brackets and internal quotation omitted)); *accord Nord*, 757 F.3d at 739 ("As the Supreme Court has recently reiterated, '[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Stanton*, 134 S. Ct. at 5 (alteration in original) (internal quotation marks omitted))). Similarly, the Eighth Circuit has "often stated that officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Williams*, 600 F.3d at 1013 (quotation omitted).

Even if Ferch's staff representatives were unqualified, Dr. Stanton is entitled to qualified immunity unless the required qualifications of staff representatives were clearly established, i.e., a reasonable official would have understood that the appointment of an individual to serve as a staff member that did not have a particular set of qualifications was unlawful. Section 549.46 does not specify the criteria for a staff representative to be considered "qualified." *See* 28 C.F.R. § 549.46(a)(3). In *Harper*, the Supreme Court stated that "the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection." 494 U.S. at 236; *accord Morgan*, 193 F.3d at 265. And, while courts have discussed generally the education, training, and experience

that may make a person qualified to understand the psychiatric issues involved with involuntary medication, it cannot be said that these qualifications are beyond debate. *Nord*, 757 F.3d at 739; *see Loughner*, 672 F.3d at 762, 764; *Morgan*, 193 F.3d at 265-66. Ferch has not shown that the state of the law was such that Dr. Stanton had fair warning that the appointment of a registered nurse, social worker, or psychologist to serve as Ferch's staff representatives during his involuntary-medication proceedings was unconstitutional. *Ellison*, 796 F.3d at 914; *Nord*, 757 F.3d at 739. "[Dr. Stanton] was neither plainly incompetent nor did [s]he knowingly violate the law." *Robinson*, 791 F.3d at 830; *accord Ellison*, 796 F.3d at 914. These appointments did not transgress any bright lines. *See Robinson*, 791 F.3d at 830; *Williams*, 600 F.3d at 1013 (quotation omitted). Because it would not be clear to a reasonable official in Dr. Stanton's position that the appointment of these individuals was unlawful, Dr. Stanton is entitled to qualified immunity on Ferch's procedural due process claim based on unqualified staff representatives.

### vi.   Summary

In sum, of the five procedural due process challenges raised by Ferch, a genuine issue of material fact exists only with respect to whether Ferch's staff representatives were sufficiently qualified. Nevertheless, even if the staff representatives were not sufficiently qualified, Dr. Stanton is entitled to qualified immunity. Therefore, the Court recommends that judgment be entered in favor of Banitt and Dr. Stanton on Ferch's procedural due process claims.

### b.  Substantive Due Process

Turning now to Ferch's substantive due process challenge, courts have, as stated above, extended *Harper*'s standard "to involuntary medication in the civil commitment context."  *Meyers*, 2014 WL 4160796, at *4; *see Loughner*, 672 F.3d at 752 ("If there was any remaining doubt in our cases about the proper standard, we now hold that when the government seeks to medicate a detainee—whether pretrial or post-conviction—on grounds that he is a danger to himself or others, the government must satisfy the standard set forth in *Harper*."); *Morgan*, 193 F.3d at 263 ("We are confident that the Supreme Court's analysis regarding the reasonableness of the regulation upheld in *Harper* applies with equal force to the 'dangerousness' component of 28 C.F.R. § 549.43(a)(5)."). Accordingly, the question is whether involuntary "medication is necessary because [Ferch] poses a danger to himself or to others in the institutional setting." *Morgan*, 193 F.3d at 263; *see Green*, 2009 WL 813972, at *3 ("*Harper* requires a specific finding that not only is involuntary administration of antipsychotic medication in plaintiff's best interests, but also that plaintiff posed a risk either to himself or others.").  "A finding that psychotropic drugs are necessary to alleviate [Ferch's] dangerousness within [FMC Rochester] is a prerequisite because it is only the government's interest in making [FMC Rochester] and [Ferch] safe that permits the forcible administration of psychotropic drugs in the first place." *McAllister*, 969 F. Supp. at 1208 (citing *Harper*, 494 U.S. at 326); *see Morgan*, 193 F.3d at 263 ("Indeed, the federal government has the same legitimate and important interest as do the states in combating a danger posed by an inmate to himself or to others in a prison, hospital, or other such institutional setting.").

64

A finding of dangerousness is reviewed for arbitrariness. *Loughner*, 672 F.3d at 757; *Morgan*, 193 F.3d at 262; *Humphreys*, 148 F. Supp. 2d at 953-54; *United States v. Keeven*, 115 F. Supp. 2d 1132, 1140 (E.D. Mo. 2000). In doing so, courts "recognize that 'deference . . . is owed to medical professionals who have the full-time responsibility of caring for mentally ill inmates . . . and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case.'" *Loughner*, 672 F.3d at 757 (alteration in original) (quoting *Harper*, 494 U.S. at 230 n. 12); *see Morgan*, 193 F.3d 262 (due process satisfied absent any indication "medical personnel failed to exercise professional judgment or otherwise acted arbitrarily in determining that Morgan should be forcibly medicated"); *Keeven*, 115 F. Supp. 2d at 1140 ("The court further finds that the decision to involuntarily medicate defendant was not arbitrary but was based on the professional judgment of the medical staff at FMC Carswell finding defendant dangerous to herself or others in the institutional setting.").

In 2011, 2012, and 2013, involuntary medication was determined to be appropriate for Ferch because he was a danger to himself and others.[12] (2011 Involuntary Medication Report at 6; 2011 Due Process Report at 3; 2012 Involuntary Medication Report at 6; 2012 Due Process Report at 3; 2013 Involuntary Medication Report at 6; 2013 Due Process Report at 2.) As the Court previously noted, the Involuntary Medication Report prepared following each hearing contained a checklist summary of the evidence presented at the particular hearing, which included, among other things, Ferch's "mental

---

[12] Ferch was also determined to be suffering from a grave disability. (2011 Involuntary Medication Report at 6.) The Court, however, focuses on the findings of dangerousness because, as the *McAllister* court observed, "[i]f the 'gravely disabled' language in the federal regulations were not read to require a showing of dangerousness within the institution, the regulation would be unconstitutional under the Due Process Clause." 969 F. Supp. at 1207-08.

health and medical records," the "[t]reatment proposal and justification," and a "[s]tatement" by [Ferch's] primary mental health clinician."   (2011 Involuntary Medication Report at 2; *accord* 2012 Involuntary Medication Report at 2; 2013 Involuntary Medication Report at 2.)   Written descriptions of statements made by Ferch, any witnesses, and the staff representatives were also included in the Involuntary Medication Reports.   (2011 Involuntary Medication Report at 3-5; 2012 Involuntary Medication Report at 3-5; 2013 Involuntary Medication Report at 3-5.)

The Due Process Reports contained similar summaries of such statements.   (2011 Due Process Report at 1; 2012 Due Process Report at 1; 2013 Due Process Report at 1.) Each Due Process Report also stated that Dr. Hart "conducted a well-documented presentation which includes Mr. Ferch's latest clinical presentation."   (2011 Due Process Report at 1; 2012 Due Process Report at 1; 2013 Due Process Report at 1.)   The Due Process Reports would then provide a brief review of Ferch's "past psychiatric history," which was followed by recent observations, incidents of note, and Dr. Hart's proposed treatment and reasons therefor.   (2011 Due Process Report at 1-2; 2012 Due Process Report at 1-3; 2013 Due Process Report at 1-3.)   The Due Process Reports ended with Dr. Maldonado's conclusion that Ferch suffers from delusional disorder and is in need of medical treatment; Dr. Hart's "proposed treatment will at least diminish [Ferch's] aggressiveness, disorganized behavior, and delusional thinking"; and Ferch is "gravely disabled and in danger of seriously hurting or harming others."   (2011 Due Process Report at 2-3; 2012 Due Process Report at 3; 2013 Due Process Report at 4.)

### i.      2011

In 2011, Ferch is described as "increasingly verbally and physically agitated," "insolent," "increasingly paranoid," "increasingly angered and voicing or reporting he suffers from no mental illness," "pressured," and "intrusive."   (2011 Involuntary Medication Report at 6; *accord* 2011 Due Process Report at 2.)  While not mentioned in the 2011 Involuntary Medication Report, the 2011 Due Process Report also noted that Ferch was "transferred to the Special Housing Unit (SHU)" in October 2011 and continued to deteriorate.  (2011 Due Process Report at 2.)

Although not referenced in either 2011 report, Dr. Hart states in her declaration that Ferch was placed "in seclusion" after "his peers reported he was pacing the hallway and making aggressive statements about getting guns and hurting people."  (Hart Decl. ¶ 10.)   Dr. Hart states that "Ferch denied making these statements, but staff were concerned about his mental state and placed him in seclusion."  (Hart Decl. ¶ 10.)  Ferch responds that "there is no documented affidavit sworn to this fact that could be used to prove this fact as she knows it is a lie of fraud just to make me look bad on paper."[13] (Pl.'s Rebuttal at 2; *accord* Pl.'s Objection at 1; *see* Am. Pl's Opposing Fraud Compl. at 1.)

While statements that Ferch intended to obtain firearms and injure others would certainly support a finding of dangerousness, *see Hardy*, 724 F.3d at 296-97 (finding of dangerousness "amply supported" by past incidents of threats of harm, attempts to bite or

---

[13] The Court presumes that Ferch means there are no sworn statements from witnesses concerning the purported statements as Dr. Hart's declaration is submitted under penalty of perjury and in accordance with 28 U.S.C. § 1746 (unsworn declarations under penalty of perjury).

hit staff, throwing liquids at the faces of individuals, and attempted and actual stabbings), even setting aside this disputed incident, the Court concludes that Dr. Maldonado did not act arbitrarily in finding that Ferch was a danger to himself and others.  After he ceased taking his medication, Ferch became increasingly agitated to the point that it was no longer safe for him to remain among the general population, and he was placed in the SHU, where he continued to deteriorate.  At the hearing, Ferch's treating psychiatrist, Dr. Hart, stated that Ferch's agitation was the result of his mental illness and that medication would help decrease the intensity of Ferch's symptoms.  "We must leave such medical judgments to medical staff and professionals."  *Loughner*, 672 F.3d at 758 (citing *Harper*, 494 U.S. at 230 n.12).   Based on the evidence presented, Dr. Maldonado concurred with Dr. Hart's professional judgment and did not act arbitrarily in finding that Ferch was a danger to himself and others.  As a result, Dr. Stanton did not act arbitrarily in denying Ferch's appeal and concluding that involuntary medication was appropriate.

### ii.    2012

In 2012, it was noted that Ferch "was convinced to continue taking his medication and as such, he continued to do so."  (2012 Involuntary Medication Report at 6; *accord* 2012 Due Process Report at 2.)  Ferch was noted to be "functioning fairly well on the open unit and compliant with his recommended treatment."   (2012 Involuntary Medication Report at 6; *accord* 2012 Due Process Report at 2.)   Ferch, however, "continue[d] to argue about his mental health, symptoms of psychosis, or need for medications."  (2012 Involuntary Medication Report at 6; *accord* 2012 Due Process Report at 2.)   Ferch also refused to work with Dr. Hart and refused medication

adjustments.   (2012 Involuntary Medication Report at 6; *accord* 2012 Due Process Report at 3.)   Additionally, it was discovered that Ferch "mailed a letter to order law enforcement badges, which he was planning to use to impersonate an investigator on the outside and work as a 'legal technician.'   When inquired further, he would not disclose any further information."   (2012 Involuntary Medication Report at 6; *accord* 2012 Due Process Report at 2-3; Hart Decl. ¶ 6.)   Dr. Hart reported that medication "might help in decreasing the intensity of the paranoid delusional thinking" and "de-escalating when [Ferch] is highly agitated."   (2012 Due Process Report.)   Dr. Hart also reported that "[h]istorically, . . . Ferch's overall functioning improved substantially, and no verbal or physical agitations were reported."   (2012 Due Process Report at 3.)

In response, Ferch states that Dr. Hart's claim that he "ordered badges to be delivered to FMC Rochester, Minnesota . . . is a total lie" and asks for the documents to prove it.   (Pl.'s Rebuttal at 2.)   Later, however, Ferch states that Dr. Hart "lied in her Declaration about the badges [he] was seeking some information about that [he] found out later [he] do[es] not need.  Why lie about the situation?"   (Pl.'s Obj. at 1.)   Indeed, the 2012 Involuntary Medication Report similarly stated that, "[w]hen asked about the letter he wrote to an outside source requesting more information on obtaining badges to become a legal technician and go into prisons, [Ferch] stated the letter was intercepted and he has since found out he cannot do that job without attorney assistance."   (2012 Involuntary Medication Report at 3.)

While Ferch appears to disagree with Dr. Hart's characterization of the reason why he sought information about badges, he ultimately does not dispute that he in fact

did seek information about badges.   The possession of unauthorized credentials by individuals civilly committed to a federal institution could well place institutional security as well as the safety of others at risk.   Both the Involuntary Medication and Due Process Reports note that Ferch's delusional disorder manifests itself in delusions regarding government corruption and legal injustice.   (2012 Involuntary Medication Report at 6; 2012 Due Process Report at 2; *see* Hart Decl. ¶ 6.)

Ferch submitted work evaluations from fall 2012.   (Ferch Ex. G at 8-10.)   But Ferch's undisputedly positive work performance does not negate the threat his other actions posed to institutional security.   Given the history of Ferch's deterioration when off medication, Ferch's refusal to comply with adjustments of his medication, and evidence that Ferch's delusions were persisting and posed a safety risk to institutional security, Dr. Maldonado's conclusion that Ferch was a danger to himself and others was based on the professional judgment of FMC Rochester's medical staff and not arbitrary. *See Loughner*, 672 F.3d at 758 (citing *Harper*, 494 U.S. at 230 n.12); *Keeven*, 115 F. Supp. 2d at 1140.   Therefore, Dr. Stanton likewise did not act arbitrarily in denying Ferch's appeal and concluding that involuntary medication was appropriate.

### iii.   2013

In 2013, it was noted that Ferch experienced increased agitation and preoccupation with injustice around the end of 2012 into February 2013.   (2013 Involuntary Medication Report at 6; 2013 Due Process Report at 2.)   Ferch continued to remain on the open unit, however, and it was noted that "[t]here have been no incidents of inappropriate or aggressive behavior."   (2013 Involuntary Medication Report at 6; *accord* 2013 Due

70

Process Report at 2; *see* 2013 Due Process Report at 3, 2013 Involuntary Medication Report at 6.)  With the exception of Ferch's refusal to take a particular medication,[14] Ferch "remained compliant with psychiatric medication under involuntary protocol," albeit "under 'duress.'"  (2013 Involuntary Medication Report at 6; *accord* 2013 Due Process Report at 2-3; *see* 2013 Due Process Report at 3; 2013 Involuntary Medication Report at 6.)  Ferch continued, however, to have paranoid delusional thinking, including an "increasing preoccup[ation] with his perceptions of a conspiracy between the psychiatrists to falsify his records in order to involuntarily treat his mental illness." (2013 Involuntary Medication Report at 6; *accord* 2013 Due Process Report at 2-3.)  It was also noted that Ferch has "[h]istorically . . . done well on medications."  (2013 Involuntary Medication Report at 6; *accord* 2013 Due Process Report at 3.)

Notwithstanding certain evidence that Ferch had been functioning fairly well as of late, Drs. Hart and Maldonado were still concerned.  As referenced above, Dr. Hart stated at the hearing that Ferch continued to suffer from delusional disorder, including paranoid delusional thinking, and was without insight into his mental illness.  Dr. Hart also stated that, in the past, Ferch's functioning improved and he was no longer agitated when on medication.  Dr. Maldonado noted Ferch's intention to no longer continue taking his medications "when he goes home" and that Ferch did not grasp the therapeutic benefits he received from his medication.  In short, Ferch's delusional disorder persisted; he was, at best, irregularly compliant with his medications; he had no insight into his mental

---

[14] Ferch refused to take "simvastatin, allegedly because it was causing him to have muscle cramps/discomfort in his shoulders and legs."  (2013 Due Process Report at 2.)  *See supra* n.7.

illness; he was preoccupied with paranoid delusional thinking that his psychiatric treatment was the result of a conspiracy against him; and he intended to stop taking his medications when he got home.

When reviewed in the light most favorable to Ferch, 2013 was certainly less eventful than prior years.  Yet, Ferch's history of deterioration when off medication is significant and cannot be disregarded.   Exercising his professional judgment, Dr. Maldonado concluded that continued medication was necessary to alleviate Ferch's dangerousness to himself and others at FMC Rochester.  Dr. Maldonado is a medical professional and the Court defers to his knowledge and expertise in treating mental illness.  *See Harper*, 494 U.S. at 230 n. 12; *Loughner*, 672 F.3d at 757.  In light of Ferch's history of deterioration when off medication, continued delusional thinking, and resolve not to take his medications unless compelled to do so, Dr. Maldonado's conclusion that Ferch was a danger to himself and others and that involuntary medication was required was not so devoid of professional judgment or so lacking in support as to render it arbitrary.  *See Loughner*, 672 F.3d at 757; *Morgan*, 193 F.3d at 262; *Keeven*, 115 F. Supp. 2d at 1140.  As a result, Dr. Stanton did not act arbitrarily in denying Ferch's appeal and concluding that involuntary medication was appropriate based on Dr. Maldonado's conclusion that medication "successfully diminished . . . Ferch's aggressiveness, disorganized behavior, and delusional thinking."  (Stanton Decl. ¶ 19.)

### iv.   Summary

Because the 2011, 2012, and 2013 findings of dangerousness were not arbitrary, the Court recommends that summary judgment be entered in favor of Dr. Stanton on Ferch's substantive due-process claims.

### 4.  Warden Jett

Although Ferch listed Warden Jett as a defendant in the BCRC, he did not include any factual allegations against Warden Jett.  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *accord Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).  "[I]ndividual government officials cannot be held liable in a *Bivens* suit unless they themselves acted unconstitutionally." *Wood v. Moss*, 134 S. Ct. 2056, 2070 (2014) (quotation omitted).  Because Ferch has not pleaded any facts showing that Warden Jett was personally involved in the violation of Ferch's constitutional rights, Ferch has failed to state a claim against Warden Jett and dismissal is warranted on this basis alone.

In responding to Defendants' Amended Motion to Dismiss, however, Ferch includes factual allegations against Warden Jett.  (Am. Pl.'s Opposing Fraud Compl. at 2.)  Defendants subsequently filed their second motion to dismiss, arguing that, notwithstanding these factual allegations, Ferch has failed to state a claim against Warden Jett.  (Defs. Mem. in Supp. of  Mot. to Dismiss at 4, 10-11.)  Accordingly, in the interests of completeness, the Court considers whether, if given leave to amend the BCRC to

include the allegations contained in the Amended Plaintiff's Opposing Fraud Complaint, Ferch can state a claim against Warden Jett.

In his Amended Plaintiff's Opposing Fraud Complaint, Ferch alleges that Warden Jett "did not stop the fraud from occurring."  (Am. Pl.'s Opposing Fraud Compl. at 2.) Ferch alleges that Warden Jett "denied all of [his] Administrative Remedies . . . concerning false statements involved in the reports that accumulated for the Due Process Hearing of 2011, 2012, and 2013 and . . . either denied the fraud exists or . . . gave [Ferch] answers of information releases saying [Ferch was] not truthful in [his] correspondence to him."  (Am. Pl.'s Opposing Fraud Compl. at 2.)

First, Ferch has failed to identify any constitutional violation committed by Warden Jett.  *See Wood*, 134 S. Ct. at 2070; *Aldaco*, 2011 WL 825624, at *3.  Second, Ferch is in essence stating that Warden Jett failed to stop the alleged fraud of his employees during the involuntary-medication proceedings.  Again,

> [i]t is well established that, for a *Bivens* claim, a supervisor cannot be liable for the acts of a subordinate simply because of the relationship between them.  Where a prisoner alleges that a warden has not adequately supervised staff, but does not allege particular facts showing deliberate indifference or tacit authorization of constitutional violations, the prisoner has no cause for relief against the warden.

*Hill v. Anderson*, No. 06-cv-4497 (PJS/JJG), 2008 WL 319898, at *4 (D. Minn. Feb. 5, 2008) (footnote and citation omitted); *see Webb v. Hedrick*, 409 F. App'x 33, 36 (8th Cir. 2010) (per curiam) ("As a non-medical professional, however, [the warden] is not personally liable for his medical staff's treatment decisions, and under *Bivens*, he cannot be held vicariously liable for their actions."  (citations omitted)); *see also Iqbal*, 556 U.S.

at 676; *Estate of Rosenberg*, 56 F.3d at 37.  Third, to the extent that Ferch is attempting to bring a claim against Warden Jett because he denied Ferch's grievances, "a prison official's decision on an inmate grievance with respect to an alleged constitutional violation does not itself render him personally liable under *Bivens*."  *Gonzalez v. Holder*, 763 F. Supp. 2d 145, 150 (D. D.C. 2011) (citing cases); *accord Arocho v. Nafziger*, 367 F. App'x 942, 955 (10th Cir. 2010) ("This court has repeatedly held, albeit in unpublished decisions, that the denial of grievances alone is insufficient to establish personal participation in the alleged constitutional violations." (quotation omitted)) (citing cases).

Therefore, even if Ferch were allowed to amend the BCRC to include the allegations in his Amended Plaintiff's Opposing Fraud Complaint, Ferch has still not shown how Warden Jett was personally involved in any constitutional violation. Accordingly, the Court recommends that summary judgment be entered in favor of Warden Jett.  *See Webb*, 409 F. App'x at 36 (citing *Iqbal*, 556 U.S. at 676, and affirming summary judgment in favor of warden as "*Bivens* liability cannot be established solely on a theory of respondeat superior"); *Eddy v. Keohane*, 242 F.3d 374, 2000 WL 1742086, at *1 (8th Cir. 2000) (per curiam) (affirming summary judgment granted in favor of warden where warden "was not personally involved in any of the complained-of conduct"); *see also Brunsting*, 601 F.3d at 820; *Smith*, 2015 WL 4636696, at *3.

## V. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendants' Amended Motion to Dismiss (ECF No. 65) be **GRANTED**.

2. Defendants' Motion to Dismiss Amended Complaint (Docket Nos. 63 and 77) (ECF No. 79) be **GRANTED**.

3. Summary judgment be entered in favor of all Defendants and this matter **BE DISMISSED**.

Date: January _____28_____, 2016            ____*s/ Tony N. Leung*_____
                                            Tony N. Leung
                                            United States Magistrate Judge
                                            for the District of Minnesota


*Ferch v. Jett et al.*
Case No. 14-cv-1961 (SRN/TNL)


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.